# CHARLESTON.

LEONARD BRAGG v. PEYTONA LUMBER COMPANY

(No. 5697)

Submitted November 16, 1926.    Decided November 23, 1926.

1. PAROL EVIDENCE—*Parol Evidence of Former Dealings Between Parties, as Well as Their Acts Subsequent to Execution of Contract, Admissible to Explain an Expression in Said Contract Which is Ambiguous.*

   Parol evidence of former dealings between the parties, as well as their acts subsequent to the execution of the contract, are admissible to explain an expression in said contract which is ambiguous.    (p. 590.)

2. CONTRACTS—*Where Jury Found That "Class B" Poles as Used in Contract Meant That Class of Poles Formerly Cut by Plaintiff and Not "Standard" Class B Poles as Contended by Plaintiff, the Fact That Plaintiff Was Delayed at Request of Defendant Because of Such Difference in Construction, Discontinued His Cutting on Notice That Defendant Would Take Nothing Less Than "Standard" Class B Poles, Does Not Constitute a Breach on Plaintiff's Part the Breach Being Defendant's Refusal to Accept Performance Offered by Plaintiff.*

   Where the jury found that "Class B" poles, as used in the contract in question, meant that class of poles formerly cut by the plaintiff as such and so accepted and disposed of by the defendant, and did not mean "standard" Class B poles as generally accepted in commercial usage, as contended for by defendant, the fact that the plaintiff was delayed several times at the request of the defendant because of such difference in construction, and that he discontinued his cutting on a subsequent notice to the effect that defendant would not take anything less than "standard" Class B poles, as contended for by its agents, does not constitute a breach on plaintiff's part—the breach being defendant's refusal to accept performance offered by plaintiff.    (p. 590.)

3. SAME—*Where in Such Case Plaintiff Stood Ready and Willing to Perform Contract According to Interpretation Put Upon it by Jury But Was Met by Refusal of Defendant and Such Refusal Dealt With Entire Future Performance of Plain-*

*tiff Thereunder, Plaintiff is Released and Performance Excused.*

Where, in such case, the plaintiff stood ready and willing to perform his contract, according to the interpretation put upon it by the jury, but was met by the unequivocal and absolute refusal of the defendant to recognize a discharge of the contract according to such interpretation, and such refusal dealt with the entire future performance of the plaintiff thereunder, this was sufficient to release the plaintiff and excuse performance. (p. 594.)

4. ACTIONS—*Right of Action Founded on Refusal of Defendant to Accept Performance as Offered by Plaintiff.*

The right of action here is founded upon the refusal of the defendant to accept performance as offered by the plaintiff, the interpretation of the latter of the contract having been the correct one and his offer and expression of willingness to perform to the extent of his duty in the premises. (p. 594.)

Error to Circuit Court, Logan County.

Action of assumpsit by Leonard Bragg against Peytona Lumber Company. Judgment for plaintiff, defendant brings error.

*Affirmed.*

*Minter & McNemar* for defendant in error.

*Fitzpatrick, Brown & Davis, Lilly & Turley* and *Chas. P. Nash, Jr.,* for plaintiff in error.


WOODS, JUDGE:

Plaintiff obtained a judgment for $3,500.00 damages in an action of assumpsit, based on an alleged breach of a certain written contract on the part of the defendant in refusing to allow plaintiff to proceed with the cutting of a large number of chestnut poles from a certain tract of land, according to the specifications set forth in said contract.

Baisden, one of the superintendents of defendant company, sometime prior to the 7th day of February, 1925, called upon plaintiff, who was experienced in cutting chestnut poles and who had cut poles under former contracts with defendant company, and advised him that his company wanted the chest-

nut poles cut on a certain tract—not more than 2,500 to be cut in any one year. As a result, a contract was entered into on the date aforesaid. So much of this contract as is necessary to a decision of this controversy reads as follows:

> "The said poles are to conform in every way to what is known as Class 'B' of Chestnut Pole specifications. They are to be cut in the lengths of 35', 40', 45' and 50', and are not to be cut in any longer lengths, unless so directed by the party of the first part. Except, however, that not more than 5% of the poles so cut will be accepted in 30' lengths, this provision being made in order to take care of poles that are damaged in hauling and slipping. The poles are to be peeled and to have the knots smoothly trimmed off, to have square buts, and tips free of splits, and with a minimum diameter of 7" at the tips. It is understood that only the small straight timber of suitable size for this purpose shall be cut, and in no case shall the tree be cut less than 13" at the stump."

The controversy hinges upon what is meant by the words "Class B" of chestnut pole specifications as used in the foregoing provision of the contract. The record disentcloses that after plaintiff had started cutting under his contract that the market for the type of poles that he had previously been used to cutting for the defendant was practically closed. And in view of this situation the construction of the words "Class B" came into question. The plaintiff claims that it means the class of pole that he had always gotten out for defendant, under former contracts, while defendant insists that it means "standard" Class B Chestnut Pole specifications, as understood in the market generally. Plaintiff makes the defendant's refusal to take nothing but standard Class B Chestnut Poles, as interpreted by it, as a breach of the contract, and instituted the present action which resulted in his favor.

The defendant comes here on writ of error, relying on the following for reversal: That the trial court erred (1) in refusing to strike out plaintiff's evidence and direct a verdict because (a) there was no evidence of a breach or renunciation of the contract by the defendant, and (b) that in abandoning

the contract the plaintiff himself was guilty of a breach; and (2) in refusing to set aside the verdict and grant a new trial, because the damages were assessed on an unreasonable and improper basis and are contrary to law.

That the contract relating to the dimensions of the poles to be cut is ambiguous, is plain. It calls for "Class B" chestnut poles, but it does not attempt to define what is included in such classification. In the light of prior dealings "Class B" poles could have meant, as between the contracting parties, something quite different from the standard Class B poles as generally understood by the commercial world. In such case the practical construction put upon it by the parties thereto is of great weight. *Lovett* v. *Gas Company,* 73 W. Va. 44. In determining the meaning of words not of certain and definite import, used in a contract, consideration will be given to the situation of the parties, the subject matter of the contract, the acts of the parties thereunder, the purpose sought to be accomplished thereby, and the general circumstances attending its execution. *Wetterwald* v. *Woodall,* 83 W. Va. 647; *Butler* v. *Carlyle,* 84 W. Va. 753; *Raleigh Lumber Co.* v. *Wilson,* 69 W. Va. 598. It is entirely proper to permit the jury to consider the situation of the parties and the circum-. stances leading up to the making of the contract for the purpose of determining whether a usage of trade operated upon the minds of the parties in using the language which was employed therein. *Walker* v. *Gateway Milling Co.,* 121 Va. 217. Where the meaning is doubtful, evidence of the acts of the parties in carrying it into execution will be considered to show their intent. *Knotts* v. *Bartlett,* 83 W. Va. 525. Practical construction of contracts is that given to the agreements by the parties themselves by acts subsequently done with reference to it. To such exposition of contract the courts pay high regard, and will effectuate it if they can do so consistently with the rules of law. *Clark* v. *Sayers & Lambert,* 55 W. Va. 521.

The plaintiff had been engaged in cutting chestnut poles at various times extending over a period of nine years, and said cutting was done in Logan County and in the vicinity where.

the poles, which form the subject matter of this controversy, were cut and were to have been cut. His last contract, whereby he cut poles for the defendant, was on what was known as the Middle Fork of Island Creek, and the poles under that contract averaged about thirteen to twenty-two inches in diameter at the butt, and from about seven to nine inches at the tip. According to the plaintiff he had always cut such poles ranging within that diameter at both ends, and such as, in his judgment, would make a good pole; that the poles he had been cutting prior to the grievance hereinafter mentioned had always been known by the plaintiff as "Class B" chestnut poles and that they had always been accepted from plaintiff by the defendant as "Class B" poles and disposed as such; that both the plaintiff and the local superintendents of defendant company had known of no other chestnut pole specification during the former contracts between plaintiff and defendant.

Under the principles of law announced the foregoing circumstances leading up to the making of the contract were proper to go to the jury on the question of the kind of poles intended by the contract. This testimony as to the intent of the parties was augmented by their acts in carrying it into execution.

According to the plaintiff's contentions, after entering into said contract, he asked Baisden regarding the class of poles to be cut, and was advised to cut the same class that he had cut on Middle Fork of Island Creek—anything that would, in his judgment, make a good pole; that soon after the cutting was begun, Kidd, another superintendent of defendant company, informed plaintiff that he was cutting the poles too big, and directed him to "get back down in the small pole line", that, "in time of war we (meaning defendant company) could have handled these poles heavier than we can now, but the time has come that we want the small poles"; that Kidd came on the property later and informed plaintiff that the trees that he had marked suited him—that they were "exactly the size pole we want", and again admonished him to "just lay off the big ones"; that after several of the marked trees had

been cut, Kidd and another representative of the company came and talked with plaintiff regarding the pole business and the poles to be cut. Plaintiff states that Kidd said: "Mr. Bragg, I want to show you what we are up against in the pole proposition. * * * There is a man come in today to buy our poles, and he says our poles wasn't big enough for him. He culled them down on us until we failed to sell them. * * * We are going to ask you to wait a few days on your contract until we see where we are at for a buyer." Plaintiff shut down for fifteen or twenty days and took his men out of the woods. He went down to see Kidd, who asked him to hold off a few days longer, and showed plaintiff for the first time the specifications he (Kidd) claimed were "standard" specifications. Plaintiff states that Kidd remarked: "If we have to cut that kind of pole for the market, we might just as well go out of the pole business now and you (plaintiff) had too." Plaintiff again called Kidd, hoping to resume work while poles were easily skinned and defendant would not allow him to go ahead cutting the poles that they had agreed to cut and, according to plaintiff, said: "You need not go back up there and cut any more poles like you have been cutting. If you get any more poles up there, Leonard, we are going to insist that you get the standard Class B poles. * * * Now, that means standard. * * * If they are one inch off, I won't have them." And on being asked if he did not intend to take care of the contract, informed the plaintiff "that is absolutely what I mean." And, further, "Your notices will show you the same thing." Plaintiff states that he then tried to make settlement with Mr. Mahan, president of defendant company, and was told that he would have to handle a larger pole known as "Standard Class B Chestnut Pole", the handling of which would cost two or three times that of the small ones. Plaintiff further testified that according to the specifications of the contract 6002 more pole trees could have been cut, while not more than 2000 more trees, in his opinion, could be found on the entire boundary that would make standard Class B poles as insisted on by defendant.

According to the testimony introduced on behalf of the defendant company, one of its representatives, with a pole in-

spector from a purchaser company, inspected the poles that had been cut, and in grading them found less than fifty per cent. to be within the standard Class B specifications; that plaintiff was requested to cease operations until a market could be found for poles already cut; and that on July 27th plaintiff was advised by letter that poles must meet standard Class B specifications; that president of defendant company, at plaintiff's request, agreed to bring up a man from the purchaser company to examine poles; that plaintiff resumed his cutting, but ceased after cutting about seventy poles; that shortly thereafter Kidd received a notification from plaintiff, that he intended to resume operations and intended to cut and deliver poles of kind and size he had theretofore cut and delivered. Mr. Kidd states that he informed plaintiff that poles which did not conform to requirements would not be accepted; that he (Kidd) was instructed by Mahan, over the 'phone, to take care of plaintiff's pay roll and hospital bills as he was doing, but *not to accept any poles that were not according to the specifications set out in the contract.* Whereupon plaintiff failed to resume operations and abandoned work, and on the 19th day of August, 1925, wrote defendant to the effect that unless he was permitted to cut the poles in accordance with the specifications and size set out and intended to be used in the contract under which he had been working, that he would be compelled to sue for damages for breach of the same. Defendant answered the following day to the effect that it was perfectly willing to carry out the terms of the contract and accept poles that conform to the specifications contained therein.

The standard Class B pole as recognized in the commercial world is admittedly a pole of much larger dimensions than the poles formerly cut by the plaintiff for the defendant as class B poles. The defendant's superintendent, as we have shown, recognized this to be true. While by their last letter the defendant expressed its willingness to abide by the terms of the contract, the interpretation put upon that contract, was in direct conflict with the interpretation put upon it by the plaintiff. The latter interpretation is substantially borne out

by the testimony introduced on the behalf of the plaintiff. As the case stood in the motion to direct a verdict, the Court would not be warranted in so doing only where the defendant's testimony on the material questions would plainly overbear that of the plaintiff. This is not the case here. Hence the jury were warranted in accepting the interpretation put upon the contract as to what was meant by the term Class B Poles. But, the defendant says, the plaintiff has no right of action for breach of contract, as he himself, by abandoning the work, was guilty of a breach. True, the rule is strict and inflexible that a plaintiff has no right of action for breach of contract where he himself has broken it. *Jones* v. *Kessler,* 98 W. Va. 1. Under the evidence the jury were warranted in believing that the plaintiff stood ready and willing to perform his contract, according to the interpretation we put upon it, but was met by the unequivocal and absolute refusal of the defendant to recognize a discharge of the contract according to such interpretation. This renunciation dealt with the entire future performance of the promissor. This was sufficient to release the plaintiff and excuse performance. *Armstrong* v. *Ross,* 61 W. Va. 38; *Bannister* v. *Victoria Coal & Coke Co.,* 63 W. Va. 502. The right of action here is founded upon the refusal of the defendant to accept performance as offered by the plaintiff, the interpretation of the latter of the contract having been the correct one and his offer and expression of willingness to perform to the extent of his duty in the premises. *Swiger* v. *Hayman,* 56 W. Va. 123; *U. S.* v. *Smoot,* 15 Wall. 36; *Dingley* v. *Oler,* 117 U. S. 490.

The last point urged by the defendant is that the damages were assessed on an unreasonable and improper basis. The plaintiff introduced testimony to the effect that he could have cut from the tract of land embraced in the contract 6002 poles of the type required by the contract according to his interpretation; that he could have made a profit of approximately ninety cents on each pole, or a total of $5401.80 on the poles to be cut. This was not controverted by any evidence of the defendant. However, the jury reduced this amount to $3,500.00.

The two controlling questions were what was the contract

and what were the damages. Both were considered and determined by the jury. On the case made we are of the opinion their verdict was warranted. We would be invading their province to disturb it. The judgment is therefore affirmed.

*Affirmed.*