JOHN B. BELL *et al. v.* WAYNE UNITED GAS COMPANY *et al.*

(No. 8056)

Submitted April 19, 1935. Decided May 21, 1935.

Maxwell and Woods, Judges, dissenting.

*Blue, Dayton & Campbell* and *Price, Smith & Spilman,* for appellants.

*W. James MacIntosh* and *Rummel, Blagg & Stone,* for appellees Owens-Illinois Glass Company and Libbey-Owens Ford Glass Company.

*Brown, Jackson & Knight* and *Milbank, Tweed, Hope & Webb,* for Chase National Bank of City of New York and Paul C. Beardslee, trustees.

Kenna, Judge:

This suit in chancery was brought on the 21st day of June, 1932, in the circuit court of Kanawha County, by John B. Bell, a stockholder in Wayne United Gas Company, and Commonwealth Gas Corporation, a creditor of that company, against Wayne United Gas Company, The Chase National Bank of the City of New York, trustee, and Paul C. Beardslee, trustee. The bill of complaint, filed on the same day, alleges that a certain contract dated June 5, 1929, by which the entire output of gas of Wayne United Gas Company was sold by it to Owens-Illinois Glass Company and Libbey-Owens Sheet Glass Company has been breached by those companies; that as a consequence of that breach, the revenues of Wayne United Gas Company had been reduced to the point that it had been compelled to default upon its interest and sinking fund payments under its mortgages; that the money to be derived from a proper performance of the contract on the

part of the buyers would be ample to meet all requirements of Wayne United Gas Company, but that that company is, with respect to paying its current obligations and carrying charges, to all intents and purposes, insolvent without it; and that, with the failure of the gas purchasers to perform under the contract continuing, a situation exists in which general creditors of Wayne United Gas Company will, in various and wasteful proceedings, subject its property to their claims. The prayer of the bill is that receivers may be appointed to conserve the properties of Wayne United Gas Company, that they may be empowered to prosecute its claims, that proper and needful injunctions may be decreed, that the properties of that company may be administered by the court, and for general relief.

Receivers were appointed on the day that the suit was brought, the Wayne United Gas Company then filing its answer admitting the allegations of the bill and consenting to the appointment of receivers as prayed.

On July 5, 1932, Chase National Bank of the City of New York and Paul C. Beardslee, trustees, under the first mortgage upon all of the properties of Wayne United Gas Company, filed their answer and cross-bill, setting up that as of June 1, 1929, the first mortgage had been executed and that default thereunder had occurred in June, 1932, and praying for a reference to take an account of the first mortgage bonds and coupons, and for the appointment of a receiver of all the properties of Wayne United Gas Company, specifically including a certain contract for the sale of gas entered into June 5, 1929, between that company and Owens-Illinois Glass Company and Libbey-Owens Sheet Glass Company. On the 27th day of March, 1933, a decree of reference was entered, referring the cause to Broun, commissioner. On April 27, 1933, certain junior lienors gave notice to the receivers that their interests would be materially affected by the proper construction, and by the enforcement on behalf of the Wayne United Gas Company, of the gas sales contract dated June 5, 1929, and requested the receivers to take appropriate action to collect any amount that might be due to the Wayne United Gas Company from the buyers, Owens-Illinois Glass Com-

pany and Libbey-Owens Sheet Glass Company. On May 19, 1933, this matter was brought to the attention of the circuit court and leave was granted to the junior lienors to file their intervening petition asserting such rights as they might believe they had in the prosecution of the claim of the Wayne United Gas Company under the gas sales contract of June 5, 1929, as against Owens-Illinois Glass Company and Libbey-Owens Sheet Glass Company. The court ordered the receivers to take no action in the matter until it could be heard and determined by the court upon the intervening petition. On June 2, 1933, the Bank of New York & Trust Company, The Chemical National Bank & Trust Company, Raymond Corporation and O. H. Simonds, Arthur B. Koontz and Elwyn Evans, receivers of the Appalachian Gas Corporation, owners in the aggregate of $421,500.00 of notes secured by the second mortgage bonds of Wayne United Gas Company, and of $17,000.00 of the Wayne United Gas Company's first mortgage bonds, as well as 92½ per centum of its capital stock, filed their intervening petition. Before final decree, Redmond & Company, Owens-Illinois Glass Company, Libbey-Owens Sheet Glass Company, and Bank of New York & Trust Company filed answers to the intervening petition. Also before final decree, Wallace G. Berlin and others, holders of $38,000.00 first mortgage bonds of the Wayne United Gas Company, filed their petition, in effect making themselves petitioners in the petition filed by Bank of New York & Trust Company and others.

The questions for decision are raised by the intervening petitions and the answers thereto, and, attempting to avoid the repetition of voluminous and detailed allegations while striving to state adequately the respective contentions and the manner of their presentation, may be condensed as follows:

The petitions alleged that Wayne United Gas Company was organized in 1929 just prior to the date of the contract with the glass companies by which it sold its entire production of natural gas, and that to that contract and the avails thereof it looked for its entire source of revenue; that at the time of its organization, it was contemplated that it should, and that it subsequently did, issue $1,500,000.00 in first mortgage

bonds, secured by its entire property, including the contract for the sale of its entire production of gas, $500,000.00 of gold notes, secured by a like amount of second mortgage bonds, deposited as collateral and in turn secured by a second mortgage upon its entire property, and its capital stock. The petition sets forth the contract of June 5, 1929, by which the Wayne United Gas Company sold its production of gas to Owens-Illinois Glass Company and Libbey-Owens Sheet Glass Company, copying in certain paragraphs *in extenso,* and alleges that under the terms of that contract, the income to be derived from the faithful performance thereof by the purchasers was sufficient to meet all of the gas company's operating expenses, interest charges, and sinking fund requirements under all of the indentures constituting charges upon its property, and that such income constituted the entire source of revenue of Wayne United Gas Company. The petition goes on to allege that the contract was breached by the buyers, by the fact that they did not take "and/or" pay for the prescribed minimum of 5,000,000 cubic feet of gas a day. It is further alleged that the breach of the contract by the glass companies brought about a situation in which it was impossible for the selling company, Wayne United Gas Company, to meet the installments of interest becoming due on its first and second mortgage bonds, or gold notes, on June 1, 1932; that at the time of the filing of the petition there was due from the glass companies for gas not taken the sum of $160,000.00; that immediately prior to June 1, 1932, negotiations with the glass companies failed to result in the collection of the amount then due, or in any other financial adjustment with the glass companies by which the interest charges about to become due under Wayne United Gas Company's mortgages could be met, and that immediately thereafter, the glass companies began to purchase Wayne United Gas Company first mortgage bonds at prices greatly depressed by the imminent default, with a view to bringing about a foreclosure, purchase of the mortgaged assets by themselves, merger of the gas sales contract and of any amount due by way of damages for a breach thereof, and the effective termination of any and all duties and obligations owed by the glass companies under its terms. It is alleged that by reason of the conduct of the

glass companies, a fiduciary duty devolved upon them to account as trustees to the Wayne United Gas Company for the first mortgage bonds of Wayne United Gas Company purchased by the glass companies, the bonds so purchased to be surrendered by the glass companies upon being reimbursed for the actual outlay and expenses incurred by them in their purchase. The petition prays that there may be an adjudication of the breach of contract on the part of the glass companies and a decree for the amount of the resultant damages, if any, therefrom; that the bonds in their hands may be ''scaled down'' to the actual cost price to them; and that the funds in the hands of the receivers, plus the amount recoverable for a breach of the contract, may be applied to the curing of the default under the mortgages.

As already stated, answers to the intervening petition were filed by the Chase National Bank of the City of New York, trustee, and Paul C. Beardslee, trustee, by Henry Fairfield Osborne, Jr., E. B. Schryver, James B. Tailer, Henry Mason Day, Allan McLane, A. Perry Osborne, general partners, Franklin Q. Brown, George H. Pendleton, special partners, doing business as Redmond & Company, and by Owens-Illinois Glass Company and Libbey-Owens-Ford Glass Company, the corporate name of the latter company having been changed from Libbey-Owens Sheet Glass Company. These answers are voluminous, and go into exact and complete detail in both denying the material allegations of the intervening petition and setting up matter constituting defense thereto. To attempt a more detailed recital of the allegations and denials by which the issues are raised, would be but confusing. It is sufficient to say that the two decisive questions in the case, as presented by the petition and the answers thereto, are:

(1)  Whether the agreement of June 5, 1929, in its true meaning, was breached by the buyers, and, if so, whether the damages growing from that breach are such as can be ascertained and adjudicated against the glass companies in this proceeding, and off-set against the amount found to be due the glass companies by reason of the first mortgage bonds now held by them.

(2)  Whether the contract itself, in its true meaning and

in the light of the circumstances attending its execution, or the circumstances existing between the parties and their conduct after the execution of the contract, or both combined, are sufficient in equity to impose upon the glass companies a fiduciary duty to the petitioners so that they now hold for the benefit of the petitioners the first mortgage bonds purchased by them, subject only to being repaid the amount of their actual investment therein, plus expenses.

Upon the incoming of the report of the commissioner in chancery, exceptions were taken to guard the same questions in so far as the report deals with them.

The proof was heard before the trial chancellor in open court and deals with every conceivable phase of the case, historically and technically, in complete and elaborate detail. The attitude of the trial chancellor was extremely liberal and all of the evidence tendered by both sides was admitted, subject, where objections were made, to reserved rulings. These rulings were never made, save in so far as the operation of the final decree itself relates to them. The great mass of testimony accompanied by its exhibits of charts, graphs, statistical tables, reports and documents, was taken mainly in justification of, or in attack upon, one side or the other of diametrically conflicting technical and expert opinions. It is impossible within the scope of an opinion to comment upon even the salient details developed in this great bulk of oral testimony and accompanying data. Upon submission of the case to the trial chancellor, he found substantially against the petitioners and in favor of the glass companies, dismissing the petition. He did not pass upon the question of the breach of the agreement of June 5, 1929, believing, as stated in a written memorandum of opinion, that it was immaterial to the case to do so, and further, that a court of equity is not the proper tribunal for determining questions of that nature. From the decree, the petitioners prosecute this appeal.

Both sides seem to regard the contract of June 5, 1929, as uncertain in its meaning. The position of petitioners is that although there is no latent ambiguity in the instrument itself and although it is complete upon its face, we must look to the circumstances surrounding the parties at the time

it was entered into, and more particularly we must compare the agreement itself with the standard form of gas purchase agreements ordinarily used by the purchasing companies, because of the fact that their standard form of contract was the basis for the preparation of the agreement of June 5, 1929, and, therefore, the departures in the latter agreement from the terms of the standard form of contract ordinarily used by the purchasers, become of particular significance. The attitude of the respondents is that the contract contains. a latent ambiguity, and that therefore the antecedent and contemporaneous conduct and declarations of the parties become admissible in its interpretation. In either view, therefore, we are justified in going outside the four corners of the instrument for the purpose of exploring its meaning.

The contract on its face recites the gas interests held by Wayne United Gas Company. It states that the seller desires to sell and the buyer desires to purchase all of the gas to be produced from the premises described during the life of the contract and subject to its terms. It is provided that, subject to the other provisions of the agreement, the buyers agree to take ''and/or'' pay for and the seller agrees to deliver from the wells on the premises and those to be drilled ''at least 5,000,000 cubic feet of gas each day during the term of this agreement, to the extent of seller's capacity to furnish said amount from said premises.'' Metering stations at or near Hany and at or near Preston are specified as points of delivery, but it is further provided that the gas so delivered shall be run through the intake side of the buyers' nearest compressor station (at that time located at Brushton) and that in the event that the buyers should construct a new compressor station affecting the lines through which the seller's gas is to be transported, that the gas shall be run through the intake side of such new compressor station at a line pressure not to exceed 60 pounds. This provision constitutes the only mention of actual line pressure contained in the entire contract, and since no new compressor station was ever constructed by the buyers, it has no direct application.

The interpretation that the seller places upon the contract is that it obligated the buyers to take a minimum delivery of

5,000,000 cubic feet of gas per day, or to pay for that amount, receiving it through the intake side of the Brushton compressor station at a line pressure to be determined as reasonable in the light of the past known history of the operation of that station. They contend that the compressor station should, during the life of the contract, have been operated in the manner of a buyer desirous of taking all the gas that could be furnished by the seller, regardless of buyers' consumption and of their supply from their own wells and from other sources which passed through the same lines. The position of the buyers is that they agreed by the contract to take "and/or" pay for a minimum of 5,000,000 cubic feet of gas a day, but that that obligation was qualified by and limited to "the extent of seller's capacity to furnish said amount from said premises." They say that the seller's capacity to furnish the gas under the contract is to be determined by the ordinary usages of the gas business, taking into consideration the open flow production and rock pressure of the seller's wells, such reasonable line pressure on the intake side of the Brushton compressor station as would conform with the usages of the gas business in general, and subject also to line pressure conditions brought about by curtailed consumption at the plant of the buyers and by the fact that gas from wells operated by the buyers and from the wells of other sellers to them was transported in the lines into which the gas furnished by Wayne United Gas Company must run. Both the petitioners and the respondents point to other provisions of the gas sales contract which, to a greater or lesser degree, add plausibility to the positions taken by them, respectively. We are of the opinion that it would be useless to go into a detailed analysis of the contentions either of law or of fact advanced by the parties in the struggle to get the interpretation of the contract settled favorably to the one or to the other. Petitioners contend that, on their theory of interpretation, the proof shows that the contract was breached. Respondents say that under their construction, it clearly was not.

It seems clear to us that the entire contract must be read in the light of the words "to the extent of seller's capacity to furnish said amount from said premises." Regardless of the

importance of other clauses of the contract, certainly it cannot be plausibly urged that either the seller or the buyers contemplated that the buyers should pay for gas in quantities over and above that which the seller had capacity to furnish. If this be true, then it is equally evident that the true interpretation of the contract and of all of its terms and provisions, rests in large measure upon the determination of what is intended by the clause quoted. With that arrived at, we have, so to speak, prepared the major premise in arriving at the conclusion we seek. No definition of "seller's capacity to furnish" is to be found within the writing itself. Therefore, it would seem that the first step must be to ascertain whether the situation presented brings the question within the recognized rule which permits the introduction of parol testimony in explanation and clarification of ambiguous language found in a written instrument. Perhaps there is no other field of law in which so many apparently conflicting declarations have been made by courts and writers. For us here to become involved in a technical discussion of many of the distinctions attempted to be made, which are often more apparent than real, we believe would serve no useful purpose. To conclude that the writing is ambiguous and then to thread through the maze of legal discussion, ambiguous in itself, in an attempt to classify the ambiguity as being either latent or patent, we do not believe would be helpful, nor does the extent to which we regard parol proof as material here require it. Nevertheless, there is a well recognized line of cases, many of them, perhaps, not drawing distinctions that are involved in the more abstruse legal discussions of the question, which, nevertheless, have permitted the introduction of parol evidence to clarify the terms of a written instrument where the difficulty presented has been the same or very closely analogous to the difficulties presented by the case at bar. See the following cases: *Bragg* v. *Lumber Co.,* 102 W. Va. 587, 135 S. E. 841, ("class B 'standard chestnut poles' "); *Prichard* v. *Oil Co.,* 75 W. Va. 450, 84 S. E. 945, L. R. A. 1916D, 1186, ("gas well"); *Semon, Bache & Co.* v. *Coppes, Zook & Mutschler Co.,* 35 Ind. App. 351, 74 N. E. 41, 111 A. S. R. 171, ("currently"); *Quarry Co.* v. *Clements,* 38 Ohio St.

587, 43 Am. Rep. 442, ("per perch"); *Miller* v. *Stevens*, 100 Mass. 518, 97 Am. Dec. 123, 1 Am. Rep. 139, ("barrels"); and *Keller* v. *Webb*, 125 Mass. 88, 28 Am. Rep. 209 ("casks"). See also the recent case of *Huntington Development & Gas Co.* v. *Topping*, 115 W. Va. 364, 176 S. E. 424, where oral evidence as to density of gas governed by line pressure controlled the decision of the case, although neither density nor line pressure was mentioned in the written agreement.

Since the rule for the admission of parol evidence and the distinctions and complications that from time to time have arisen in its application are all based upon decided cases, it would seem to us that the essential importance of the situation rests, not so much in the application of the various distinctions that have from time to time been considered in applying the rule, but in the actual determination of the question before us judged by whether the case presents a situation in which it is fundamentally necessary to have recourse to parol evidence in order to determine the meaning of the agreement actually entered into between the parties and represented in its entirety by the written instrument. As we have already stated, it seems to us that the correct meaning of the phrase in question lies at the very foundation of a proper understanding of the contract itself, and, because of the further fact that the contract itself contains nothing from which that phrase may be defined, the matter is one in which it is vitally necessary to look outside for the explanation in order to avoid declaring the instrument void for uncertainty.

In having recourse to the vast amount of proof that this record contains for the purpose of procuring light upon the meaning of the particular part of the contract more directly under consideration, we do not believe that it is necessary for us to go further than to regard that part of the proof which relates to the usages of the gas business that must be held to have been in the minds of the parties at the time that they contracted. We believe that in considering this phase of the matter, the trial court was confronted by a great deal of conflict in the proof, but that he was warranted in reaching two conclusions that would fully justify the finding that the contract contemplated reasonable line pressure on the basis

of general usage. Although there is conflict as to whether this contract contemplated the usage as to line pressure that would be determined by considering alone what might be regarded as the usage in the furnishing of industrial gas, or whether it contemplated the usual line pressure in the furnishing of what might be regarded as utility gas, we believe that the trial court was justified, under the circumstances shown, in ignoring this distinction and in reaching his conclusion on the broad basis of a usage that included both. Furthermore, we regard the proof to the effect that good operating usage looking to the proper care of the producer's wells contemplates taking therefrom not more than thirty per centum of their open flow production and a line pressure consistent with taking approximately that amount of gas, as of particular relevance in arriving at the line pressure contemplated by the contract. We are of the opinion that the trial court was at liberty from the proof to determine the question of line pressure on the basis of the usages indicated. We are further of the opinion that, on the same basis, the trial chancellor's finding to the effect that reasonable line pressures were contemplated by the contract and were maintained by the buyers, as expressed in the memorandum of opinion filed in the case by him, is not to be disturbed.

The extent to which the standard form of gas purchase contract in use by the glass companies actually influenced the preparation of the final draft of the contract of June 5, 1929, is so greatly obscured by the protracted and spirited negotiations that took place between the time that the tentative draft was prepared and the time the final draft was settled upon, that we do not regard the evidence in this respect as being particularly convincing. It seems to us that with respect to the question of line pressure, it might be plausibly contended that on the one hand the purpose in the beginning was to adhere to the standard form, while on the other the purpose was to depart from its provisions.

But the learned trial chancellor regarded the breach of the contract as being immaterial, because, even on the theory of the petitioners as to the amount recoverable for the breach, that amount, plus all other cash in the hands of the receivers

available for the purpose, would not be sufficient to cure the default in the payment of the bonds and interest and cause a dismissal of the proceeding. In so far as the breach of the contract relates to this specific question, no doubt the trial chancellor was correct, but we are of opinion that his position does not regard another aspect of the matter in which, under the circumstances of this case and the manner of its development, the question of breach or no breach becomes quite material. A breach of contract is asserted, the damages resulting from which would approximate $270,000.00 at the date of the decree complained of. All of the proof concerning the contract, the alleged breach, conduct of the parties and the consequences of the alleged breach, if any, was before the court. Under these circumstances, we think it would have been quite proper, and, indeed, was necessary, in order to permit intelligent bidding and in order to obviate an harassing and expensive retrial of matters already fully before the court, that these questions should have been settled. *Abney-Barnes Co.* v. *Coal Company,* 83 W. Va. 293, 98 S. E. 298. We do not wish to say as a general proposition that unliquidated claims for damages in the hands of receivers are required to be adjudicated before sale, and are restricting the holding on this phase of the matter to the peculiar circumstances of this case. While it is not usually the function of a court in chancery to resolve questions sounding in damages for a breach of a contract, there are undoubtedly instances in which such a finding becomes so interwoven with a proper exercise of its equitable function, that in order to prevent unreasonable hardships, delays and the multiplicity of suits, it becomes essential for a court in chancery, having gained jurisdiction of the subject matter and of the parties on different equitable grounds, to resolve such questions. *Charlton* v. *Chevrolet Motor Co.,* 115 W. Va. 25, 174 S. E. 570; *Cecil* v. *Clark,* 44 W. Va. 659, 30 S. E. 216; *Downes* v. *Lumber Co.,* 99 W. Va. 267, 128 S. E. 385. We believe that this is a typical case calling for the exercise of that power. *Lynch* v. *Metropolitan El. Ry. Co.,* 129 N. Y. 274, 29 N. E. 315, 26 A. S. R. 523, 15 L. R. A. 286; *Taylor* v. *Florida East Coast R. Co.,* 54 Fla. 635, 45 So. 574, 127 A. S. R. 155, 14 Ann. Cas. 472, 16

L. R. A. (N. S.) 307; *Price* v. *Oakfield Highland Creamery Co.*, 87 Wis. 536, 58 N. W. 1039, 24 L. R. A. 333.

In the light of the fact that the trial chancellor did not pass upon the question of breach of the contract of June 5, 1929, it might be urged that his discussion of its interpretation was unnecessary, and if so, that the question of interpretation is not now really before this court. We feel, however, that the question of interpretation is to an extent involved in determining the question of whether a fiduciary duty devolved upon the glass companies and that the discussion of the question herein is further justified by the purpose for which the case is to be remanded.

The second question raised concerns the contention of petitioners that the bonds in the hands of the glass companies should not be collected by them, nor used in bidding upon the property at the foreclosure sale, at their face value, but that they should be held to be redeemable from the glass companies by payment to them of their actual cost price, plus expenses. The assertion is made by the petitioners that the bonds in the hands of the glass companies are to be impressed with a trust "constructive, implied, *ex maleficio, ex delicto* or *in invitum*," and that a fiduciary relationship exists between the glass companies and Wayne United Gas Company "in fact, even if not technically so." They furthermore contend that the glass companies stand in relation to the bonds of the Wayne United Gas Company as a vendee in possession of real estate stands toward the vendor in an executory contract of sale "or, if not strictly so, in such relation as to bring them within the doctrine applicable to vendor and vendee." These contentions are advanced regardless of whether the gas purchase contract has been breached.

It is not contended that at the time of entering into the gas sales contract, the glass companies had in mind a purpose to bring about a breach that would result in default of interest and sinking fund payments and subsequent foreclosure under the mortgage of Wayne United Gas Company. Neither is it contended that the breach alleged to have taken place in the contract for the sale of gas was brought about by the glass companies with the idea of causing default and subsequent

sale of the Wayne United Gas Company properties. Apparently, we must look to the bond purchases of the glass companies, in the light of the breach, however innocent of ulterior design, or in the absence of a breach, as constituting the act which subjected them to the fiduciary obligation that petitioners contend for. Petitioners' position seems to be that to permit the glass companies to enforce collection at their face value of the bonds held by them would be to permit them to take advantage of their own wrong. A great many statements from decided cases and from text-writers to the general effect that equity will not permit that situation to exist, and will charge property that may be involved with a trust in order to prevent it, are quoted and referred to in the brief of petitioners. Adding our efforts to those exhaustive efforts that we are certain were made by able counsel for the petitioners, we have been unable to find any decided case in which it has been held that the principle invoked is applicable to a case presenting facts similar to those presented by the case at bar.

The case most strongly relied upon by the petitioners is that of *Farmers' Loan & Trust Company* v. *New York & N. R. Co.*, 150 N. Y. 410, 44 N. E. 1045, 55 A. S. R. 689, 34 L. R. A. 76. In that case, one railroad company had acquired a majority of the stock and second mortgage bonds of another railroad company with the avowed purpose of gaining control of the former's physical properties, to the exclusion of the minority stockholders, by means of a foreclosure proceeding. With this in view, by voting its stock, it had elected its own officers and directors of the mortgagor company. Proof was offered tending strongly to show that while in the management of the mortgagor company, the first company, holding a majority of the stock of the second, had diverted business from the latter in an effort to bring about a default under the mortgage. This proof was rejected and certain findings were refused by the trial chancellor on the theory that the purpose of the majority stockholder was immaterial. The case was reversed, as we read it, on the question of the duties owed by majority stockholders to those holding a minority of the stock in a corporation, the court carefully

pointing out: "That any person or corporation authorized to do so might have purchased the bonds of the New York & Northern Railway Company, and have rigorously enforced them by a sale of its property, there can be no doubt." The court further points out that the ownership of a majority of the stock as well as of the bonds would not prevent a foreclosure by the holders of both as long as the purpose of the holder was *bona fide* and its conduct in good faith. We do not see that the case sustains the position of petitioners.

The general equitable principle contended for may be admitted without recourse to the authorities, as it may also be admitted that courts in applying the equitable principle in question will not attempt strictly to define the circumstances to which it is applicable. Here, the argument of the petitioners makes it rest upon the wrong of the glass companies, although it is not contended that there was any ulterior purpose in the alleged breach of the gas purchase contract. There was nothing *per se* wrongful in the purchase of the bonds of the Wayne United Gas Company by the glass companies unless there was at that time some fiduciary relationship between them and the Wayne United Gas Company. *Farmers' Loan & Trust Company* v. *New York & N. R. Co.,* 150 N. Y. 410, 44 N. E. 1043, 55 A. S. R. 689, 34 L. R. A. 76; *Commonwealth Title & Trust Co.* v. *N. J. Lime Co.,* 86 N. J. Eq. 450, 100 Atl. 52. The Wayne United Gas Company had as much information as to the holders of the bonds and as much opportunity to purchase the bonds as did the glass companies. The junior lienors had, or could easily have acquired, the information necessary to enable them to purchase the bonds had they so desired. We do not see how the purchase of the bonds could in itself have created a fiduciary relationship, even though it is true that the glass companies, in making their purchases of bonds, acted through an agent without disclosing themselves as principals. What, then, is the pre-existing wrong committed by the glass companies that charges their bond purchase with a trust? It seems to be contended that although it is not shown that the contract was breached through any ulterior or oppressive motive on the part of the glass companies, that by reason of the fact that they pur-

chased the bonds that effect must be given to the breach of contract, notwithstanding that at the time of the breach there existed no reason to attach such effect to it. This would seem to be an effort to make the purchase of the bonds on the part of the glass companies serve both to create a fiduciary relationship between them and the Wayne United Gas Company, and also to serve as a breach of that relationship which would charge the bonds purchased by them with a trust. If the glass companies were free from all fiduciary duty to the petitioners at the time they purchased the bonds, then they took the bonds with all of the rights of ordinary holders, including the right to foreclose in event of default. In order to cause the bond purchases to inure to the benefit of Wayne United Gas Company, some fiduciary duty toward it from the purchasers must have existed at the time of the purchase. We do not think it has been shown.

The contract was not imposed upon Wayne United Gas Company. The glass companies had no position of dominance from which they could impose oppressive terms. All parties to the agreement were represented by able counsel throughout protracted negotiations. There was no capricious breach on the part of the glass companies. They simply insisted upon having the meaning of an ambiguous instrument settled by judicial interpretation before paying a large sum of money on the basis of the interpretation of the opposite party to the agreement. There was no acquiescence on their part to the position taken by Wayne United Gas Company. Over a long period, that company did not bill the glass companies monthly for available gas not taken, as the contract required. Neither did it notify the glass companies of default as provided in the contract, at least, it made no effort to do so until long after the difficulty had arisen. If Wayne United Gas Company had diligently pursued the courses plainly indicated by the contract in these respects, proper and prompt tests might have been conducted to decide this unfortunate controversy, and the dispute would not have arisen at a time when that company's financial need was so acute and when so large a sum was involved in its solution.

But supposing a fiduciary duty with respect to the bonds

purchased by the glass companies actually did arise, and supposing that the glass companies are indeed trustees by reason of their bond purchases, under this proof, it is still difficult to say by what reasoning the bonds would be held for the benefit of Wayne United Gas Company or of its junior lienors. Neither of them had any property right in the bonds purchased by the glass companies and neither of them was in the least degree affected by the price that the glass companies paid for the bonds they purchased. Their rights were subject to the bonded debt at face value. A different situation might arise at the suit of a complaining former owner of bonds if it were shown that, in consequence of fraudulent conduct of the glass companies, bonds had been parted with at a price substantially lower than their true and actual value. In such a case, it might be said that the glass companies, if their fraud were shown, held the bonds as trustees for the former owner. It is difficult to see how such a holding in favor of persons who have never had a property right in the bonds could be arrived at on the basis of the proof here.

It remains to comment upon the theory that the glass companies stand in relation to Wayne United Gas Company, as a vendee in possession of real estate under an executory contract of sale, stands to his vendor. The principle stated is based upon the presumptions that spring from actual possession of real estate, and is intended to prevent a person from gaining that possession and the benefit of those presumptions and, while enjoying them, attacking the very title under which they were acquired. The same doctrine is applied to the relationship of landlord and tenant. We do not think its elements are present in this case.

For the reasons discussed, we are of the opinion that the trial chancellor's decree, in so far as it refused to find that the glass companies held the bonds purchased by them for the use and benefit of the petitioners, was without error.

We are of opinion to affirm the decree of the trial chancellor in so far as it finds that the glass companies are the *bona fide* owners and holders of the bonds purchased by them, and to remand the cause with directions to the trial chancellor, on the present proof, to amplify the decree to the extent of

finding whether the gas purchase contract of June 5, 1929, was in fact breached by the glass companies, and if it was so breached, the amount of resultant damages, such finding to be governed by the principles herein discussed.

We do not pass upon the question of whether the proof shows the gas sales contract to have been breached, because that question was not passed upon by the trial chancellor. *Cameron* v. *Cameron*, 105 W. Va. 621, 143 S. E. 349. The finding here is not to be taken as indicating, directly or indirectly, what the proof justifies in this respect, save to the extent that it is expressly commented upon herein.

*Affirmed in part; reversed in part; remanded.*

MAXWELL, JUDGE, dissenting:

The involvements of the contract are accentuated by the frequent use of the baffling symbol "and/or"—a disingenuous modernistic hybrid, inept and irritating.

Whether there was default by the glass companies in fulfillment of the contract of June 5, 1929, and whether, if there was such default, they are liable in damages to the gas company, and, if so, in what amount, are undoubtedly matters which should be determined in this cause upon remand to the trial court.

But without regard to the result of that inquiry, I am of opinion that the questions in respect of the first mortgage bonds of the gas company which have been purchased by the glass companies should be disposed of in conformity with the position urged on behalf of the gas company or its receivers. I am impressed that the contract and dealings between the gas company and the glass companies were such as to constitute a fiduciary relation. Confidence was reciprocal. The gas company spent large sums of money on the basis of that confidence, and when default on its bonds seemed imminent, June 1, 1932, full disclosure of that situation was made to the glass companies. Immediately after that disclosure the glass companies began secretly to purchase outstanding bonds of the gas company at far less than face value. Here is basis for a constructive trust. "A constructive trust arises not from

agreement of parties, express or implied, but from the construction and operation of equity in order to satisfy the demands of justice.'' *Power Co.* v. *Railroad Co.,* 113 W. Va. 20, 166 S. E. 536. Consult 3 Pomeroy's Eq. Jur. (4th Ed.), secs. 1044, 1053.

Because of the general economic and industrial depression the glass companies did not need the full amount of gas contemplated by the contract of June 5, 1929. The contract had therefore become burdensome. With these facts noted, it is not to be presumed that the purchase of the bonds was unrelated to the bearing which their ownership would have on the contractual situation. But, whatever the purpose and motive, the glass companies did purchase about ninety-two per centum of the first mortgage bonds of the gas company. By purchasing these bonds, the glass companies presumably placed themselves in position to control the sale of the gas company's properties, and, incidentally, to get rid of the troublesome gas contract. Authority need not be cited for the basic equitable principle that a party to a fiduciary relationship may not acquire for his own benefit outstanding rights in the subject matter, antagonistic to another party associated in the trust relationship. Where such outstanding interests are thus acquired, equity requires that they be held for the benefit of all who are concerned in the confidential association.

Therefore, I am of opinion that the gas company or its receivers should be granted leave, in accordance with the prayer of the petition of the intervenors, to redeem the bonds by paying to the glass companies the amount paid by them for the bonds. Such amount should, of course, be credited with the amount of damages, if any, which shall be ascertained to be owing by the glass companies to the gas company on account of the alleged breach of the aforesaid contract of June, 1929. Upon such payment, less said credit, if any, the glass companies should be required to turn over the bonds to the gas company or its receivers, to the end that the gas company's properties may be relieved of forced sale under the mortgage securing the bonds.

So far as these observations are at variance with the decision, I dissent therefrom.

Judge Woods authorizes me to say that he concurs herein.