A. Z. LITZ *v.* FIRST HUNTINGTON NATIONAL BANK

(No. 8750)

Submitted April 26, 1938.   Decided June 14, 1938.

*E. L. Hogsett, J. W. St. Clair* and *M. O. Litz,* for appellant.

*Fitzpatrick, Brown & Davis,* for appellees.

RILEY, JUDGE:

A. Z. Litz brought this suit in equity against First Huntington National Bank, R. R. Smith and F. C. Leftwich, Trustee in Bankruptcy of R. R. Smith, a bankrupt, to enjoin the defendant, First Huntington National Bank, from selling seventy shares of the capital stock, represented by certificate No. 147, of Central Realty Company (owner of Frederick Hotel in the City of Huntington), which the bank held as collateral security, and to have the title in the shares of stock adjudicated in him. From a decree dismissing the bill of complaint, plaintiff appeals.

For a number of years, Litz and Smith had been associated in business. In 1923, they decided to acquire substantial stock holdings in the Central Realty Company, and to have the stock, when acquired, issued in the name

of "Litz-Smith Holding Company," a fictitious name adopted by them for convenience, having in mind the purpose ultimately of dividing the stock equally between themselves. On April 19, 1923, the total stock acquired (668 1/2 shares) was reissued in the name of "Litz-Smith Holding Company", the transfer being evidenced by seven stock certificates of which one, No. 147, represents the seventy shares of stock in controversy. The stock book was held by a common agent and equally available to Litz and Smith.

On July 30, 1925, Smith, without Litz' consent or knowledge, after indorsing said certificate No. 147 "Litz-Smith Holding Company, by R. R. Smith," pledged the shares represented thereby to the bank to secure, so appellant claims, $115,000.00 primary indebtedness and $35,000.00 secondary indebtedness of Smith to the Bank, and further to secure future loans or advancements. A notation was attached to the stub in the stock book which read, "This re-issued 70 shares used by me as collateral security July 30, 1925, R. R. Smith." After this pledge, one C. L. Ritter, on behalf of himself and Litz, purchased (October 22, 1925) of Smith one-half of the 668 1/2 shares of the realty company stock (no account being taken of the seventy shares pledged) standing in the name of Litz-Smith Holding Company for $285.00 per share. Pursuant thereto, a certificate representing 334 shares of the Realty Company stock was issued in the name of C. L. Ritter. On October 28, 1925, 167 of of the 334 shares issued to Ritter were re-issued in Litz' name in pursuance of the prior arrangement between them. At the time of these transfers, Litz was unaware of the pledge to the defendant bank, and when the transfer was made to Ritter, Smith was unaware of Litz' secretive participation therein. Litz testified that he did not indorse any of the certificates of stock of Central Realty Company issued in the name of Litz-Smith Holding Company. That being so, the transfer to Ritter and through Ritter to Litz, mechanically, so far as the issuance of the certificates is concerned, was made in the

same way as the transfer to the bank in that the transfers were made solely upon Smith's indorsement.

When Litz sought to have his half (334 shares) of the stock holdings re-issued in his wife's name, he, for the first time, learned of the pledging of the seventy shares of stock by Smith. Thereupon, he and Smith called upon the bank and demanded release of the seventy shares. This demand was refused then and consistently at all times thereafter.

On January 13, 1926, the balance of the shares of stock remaining in the name of Litz-Smith Holding Company, that is, 334 1/2 shares less the seventy, or 264 1/2 shares, were issued to Mrs. Litz. Litz thereafter, on February 20, 1927, deposited these shares (264 1/2) with the bank in lieu of Liberty Bonds, which Smith had up as collateral for a $42,000.00 note, in order that Smith could use the proceeds of said bonds to pay taxes. It was clearly understood, however, that the deposit of Mrs. Litz' stock would secure only the aforesaid $42,000.00 note.

From the time of the pledge until January, 1927, there was no increase in Smith's indebtedness to the bank. However, thereafter, his indebtedness materially increased. On June 1, 1929, so appellant claims, Smith's obligations to the bank were in the amount of $220,000.00, of which $90,000.00 was secondary liability. On the last date, he executed to the bank, as additional security for his indebtedness, a first mortgage, his wife joining therein, on a one-third interest in the surface, oil, gas and timber of approximately 20,000 acres of land and 8,000 acres of oil and gas leaseholds, situate in the State of Kentucky. The outstanding two-thirds interest in the properties resided in the Houston estate, the parties interested therein being located in Cincinnati. Litz and Smith claim that this mortgage was executed under an agreement with the bank that the seventy shares of stock would be released. The existence of this agreement is categorically denied by Gohen, the bank's president. At the time the mortgage was executed, evidently Smith

regarded the properties as having substantial value. There is evidence to the effect that the timber consisted of eighty or ninety million feet, worth $4.00 per thousand feet; that the United Fuel Gas Company had offered $2,000,000.00 for the 8,000 acres of oil and gas leaseholds, which offer was later withdrawn, and that the oil and gas interest in the 20,000 acres had, according to a recent offer, a value of one dollar per acre delay rental and one-eighth of the oil and gas produced. The evidence of these values does not embrace the value of the surface of the 20,000 acres. The coal under the 20,-000 acres was owned by Kentucky By-Products Coal Company. Prior to the execution of the first mortgage, Smith had placed with the bank, as additional collateral for his indebtedness, 2,500 shares of the stock of this company, which, according to his testimony, was worth $125,000.00.

A second mortgage was executed by Smith to the Union Bank and Trust Company of Huntington, on January 7, 1930, to secure an indebtedness of $115,000.00.

The record discloses that, with the passing of time, Smith's financial position became precarious; the Houstons found it increasingly difficult to carry the property; and efforts were then made to dispose of the oil and gas property owned jointly by Smith and the Houston estate. As a final result, Gohen, representing both Smith and the bank, in conjunction with the Houston interests, consummated an agreement of sale to the United Fuel Gas Company of the oil and gas properties covered by the mortgage and certain oil and gas leaseholds in Wayne County, West Virginia, owned by Smith and the Houstons. Thereby, the gas company undertook to pay for the oil and gas interests $1,500,000.00, par value, of the Columbia Gas & Electric Company's gold bonds of 1952 issue, subject to deductions for imperfect titles. The gas company subsequently advised that the deductions amounted to $325,000.00. Smith, Gohen and Houston's representatives then met in Cincinnati, in November, 1931, for the purpose of executing the papers of sale.

As a result, the bank agreed to release (1) its mortgage on the Kentucky property; and (2) the 2,500 shares of Kentucky By-Products Coal Company stock in consideration of $197,500.00 of the Columbia Gas & Electric Company bonds. The remainder of the bonds representing Smith's interest in the property, amounting to $193,-000.00, were distributed (1) $115,000.00 in full satisfaction of the indebtedness due the Union Bank & Trust Company; (2) $2,500.00 contribution to a $20,000.00 fund paid to Mrs. Smith; and (3) the residue to be held by Gohen, subject to Smith's order, which latter bonds were later attached in New York at the instance of a Cincinnati Bank. Pursuant to the agreement, the 264½ shares of the Litz-Smith Holding Company stock belonging to Mrs. Litz were returned. Shortly after the sale, Smith was adjudicated a bankrupt.

After sale of the $197,500.00 in bonds received by the bank and other collateral held, the bank claimed a balance of unsatisfied indebtedness against Smith in the amount of $16,728.68. It then gave notice of sale of the seventy shares of stock to satisfy this remainder of the indebtedness.

During the course of these transactions, Litz attended directors' meetings of the bank and knew that Smith's notes were being renewed from time to time. The record discloses that Gohen, the bank's president, had discussed with him the efforts to sell Smith's interest in the oil and gas properties. He, however, was uninformed of the meeting in Cincinnati; had no notice of the meeting in New York at which the sale was finally consummated; and the details of the sale did not come to his knowledge until after its completion.

Plaintiff's first position is two-fold. He says, in substance, that the issuance of the shares of stock in a fictitious name is tantamount to issuance in the name of Litz and Smith; therefore, neither one could sell without the other joining therein; and that if the claimed pledge had any legal effect, it constituted only an equitable pledge of one-half of the stock.

In the assertion of this position, plaintiff necessarily ignored the course of dealings between the parties. Were it not for the procedure entertained by Smith, with the secretive cognizance of Litz, in the Ritter transfer, plaintiff's first position might be tenable. Ordinarily, a seller can convey only such title in a chattel as he himself owns. 24 R. C. L. 373, sec. 662; 14 C. J., 672; *Ullman & Co.* v. *Biddle,* 53 W. Va. 415, 417, 44 S. E. 280; *Richlands Brick Corporation* v. *Hurst Hardware Co.,* 80 W. Va. 476, 92 S. E. 685. A like rule applies to pledges. *Patton* v. *Joliff,* 44 W. Va. 88, 28 S. E. 740. So, a joint, or co-owner, cannot pledge any further right or interest than he has in the property. 49 C. J. 900-1, and cases there cited; Jones on Collateral Securities (Pledges), 3d Ed., sec. 65; Jones on Chattel Mortgages (5th Ed.), 72, secs. 47, 48; *Lucado* v. *Lester,* 105 W. Va. 491, 143 S. E. 155; *Fraus* v. *Young,* 24 Iowa 375; *Jewell* v. *Gann,* 100 Kans. 43, 163 Pac. 645.

The shares of stock, being registered in a fictitious name and not in the individual names of Litz and Smith, either party could have transferred his undivided interest therein. The circumstances of the instant case, however, take it beyond the general rule. The acquisition of the stock and its co-ownership was necessarily the result of a contractual relationship between the co-owners. In fact, the parties agreed to acquire the shares of stock and hold them in a fictitious name. True, the express terms of the contract, in detail, do not appear in the record. All the more reason why the relations between the parties should be measured in the light of their interpretation as shown by their own course of conduct. Smith, without Litz' participation by indorsement or otherwise, assigned the seventy shares in controversy to the defendant bank for the purpose of the pledge. Shortly thereafter, Litz arranged with Ritter, without informing Smith of his interest therein, for the purchase by Ritter of one-half of the 668½ shares of the realty company stock. As a result, solely upon Smith's indorsement, a certificate representing 334 shares of the stock was is-

sued in Ritter's name, who, in turn, and pursuant to the arrangement between them, caused a certificate for 167 shares of the stock to be issued to Litz. The latter, by his secret participation in this transaction and the acceptance and retention of the 167 shares of stock, acknowledged Smith's unbridled authority to transfer the shares and sever the tenancy. If the tenancy was severed, as it undoubtedly was, by the Ritter-Litz transfer, it was also severed in the bank's pledge. Litz and Smith are bound by the interpretation which they *themselves*, by their course of conduct, put upon the relation of co-ownership. Contracts, indefinite or ambiguous in their terms, will be interpreted by courts in the light of the conduct of the parties thereunder. "In the determination of the meaning of an indefinite or ambiguous contract, the interpretation placed upon the contract by the parties themselves is to be considered by the court and is entitled to great, if not controlling, influence in ascertaining their understanding of its terms. In fact, the courts will generally follow such practical interpretation of a doubtful contract." 12 Am. Jur. 787, sec. 249. See *Ramage* v. *South Penn Oil Co.*, 94 W. Va. 81, 118 S. E. 162, 31 A. L. R. 1509; *Hutchinson* v. *Judy*, 104 W. Va. 449, 451, 140 S. E. 285; *Bragg* v. *Peytona Lumber Co.*, 102 W. Va. 587, 590, 135 S. E. 841; *Summit Coal Co.* v. *Raleigh Smokeless Fuel Co.*, 99 W. Va. 11, 18, 128 S. E. 298.

Upon close analysis of the record and briefs, it appears that Litz contends that Smith had no right to assign the seventy shares to the bank, without both joining in the indorsement of the certificates, but that in the Ritter transaction, by which he hoped to benefit, the right existed. Clearly, his positions are inconsistent. During the course of the same litigation, a party cannot take inconsistent and divergent positions. *Greenbrier Laundry Co.* v. *Fidelity & Casualty Co.*, 116 W. Va. 88, 178 S. E. 631; *Keller* v. *Norfolk Ry. Co.*, 113 W. Va. 286, 293, 167 S. E. 448; *Central Trust Co.* v. *Cook*, 111 W. Va. 637, 163 S. E. 60; *Ealy* v. *Shelter Ice Cream Co.*, 110 W. Va. 502, 158 S. E. 781; *Clay*

*County Bank* v. *Wilson*, 109 W. Va. 684, 158 S. E. 517; *Thompson* v. *Beasley*, 107 W. Va. 75, 146 S. E. 885; *Monongahela West Penn Pub. Ser. Co. et al.* v. *Commission*, 104 W. Va. 183, 187, 139 S. E. 744; *State* v. *Price*, 100 W. Va. 699, 131 S. E. 710; *MacDonald* v. *Long*, 100 W. Va. 551, 131 S. E. 252; *Bush* v. *Ralphsnyder*, 100 W. Va. 464, 130 S. E. 807. It follows that the seventy shares of stock became the property of the bank for the purposes of the pledge.

The remaining contentions of the appellant are based on ownership in him of the general title to the seventy shares, subject to the pledge. Claiming to occupy the position of equitable surety as to the pledged stock, appellant says (1) that the pledge was limited to the indebtedness of Smith at the time the bank received notice of appellant's ownership, and did not cover advances made by the bank after demand on it for the release of the stock (citing *Hall* v. *Williamson Grocery Co.*, 69 W. Va. 671, 72 S. E. 180; *Simms* v. *Ramsey*, 79 W. Va. 267, 272, 90 S. E. 842; 41 C. J., 527; Jones, Mortgages, sec. 368; *Frye* v. *Bank of Illinois*, 11 Ill. 367; *Hughes* v. *Worley*, 1 Bibb [Ky.] 200; *Bell* v. *Fleming's Exrs.*, 12 N. J. Eq. 490; *Hall* v. *Crouse*, 13 Hun, [N. Y.] 557; *Todd* v. *Outlaw*, 79 N. C. 235; *Spader* v. *Lawler*, 17 Ohio 371, 49 Am. Dec. 461) ; and (2) that the bank, by releasing the mortgage and other collateral, lost its right to sell said stock.

The answer to the foregoing positions lies in a factual situation which needs no exposition of legal principles. Litz, during the whole course of the transactions, was a director of the bank. As such director, and from his conversations with Gohen, the bank's president, Litz knew of Smith's renewals, and should have known of the advancements incorporated in them, of Smith's desperate financial situation, increasing with the passing of time, and of Gohen's effort to effect a sale with the Gas Company. Moreover, the record discloses that Gohen had fear of the bank's integrity and safety; and the sale to the Gas Company, which necessarily required the re-

lease of the mortgage, was prompted to a large measure by the difficult position in which the bank found itself due, in part, to Smith's distressful circumstances. Plaintiff's denial of this situation is brushed aside by the findings of the trial chancellor. Unless clearly wrong, the findings of the trial chancellor will not be disturbed on appeal. *Highland* v. *Davis,* 119 W. Va. 501, 195 S. E. 604 ;*Spradling* v. *Spradling,* 118 W. Va. 308, 190 S. E. 537; *Wade* v. *Wade,* 115 W. Va. 132, 174 S. E. 787; *First Nat. Bank* v. *McCloud,* 112 W. Va. 537, 540, 165 S. E. 799.

Notwithstanding all these things, Litz, except for demands on the bank which were consistently refused, remained inactive and took no legal steps to assert his claim to the seventy shares of stock in controversy. He allowed about six years to elapse after he had notice of the pledge until after the sale to the United Fuel Company, before he instituted this suit. During this period of time, by the course of events herein narrated, the bank's situation became materially altered. A party charged with laches to such a degree cannot be afforded relief in a court of equity. Laches is a delay in the assertion of a right which works disadvantage to another. *Hall* v. *Mortgage Security Corporation of America,* 119 W. Va. 140, 192 S. E. 145, 111 A. L. R. 118; *Jarrett* v. *Bank,* 112 W. Va. 254, 164 S. E. 180; *Engel* v. *South Penn Oil Company,* 106 W. Va. 339, 146 S. E. 385; *Camden* v. *Fink Coal & Coke Co.,* 106 W. Va. 312, 145 S. E. 575, 61 A. L. R. 584; *Galliher* v. *Cadwell,* 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738. Clearly, Litz' delay worked to the disadvantage of the defendant bank. He therefore is not entitled to the relief sought in this suit.

For the foregoing reasons the final decree should be affirmed.

*Affirmed.*