HOMER SPRINGSTON *v.* THOMAS W. POWELL *et al.*

(No. 7458)

Submitted May 2, 1933. Decided May 9, 1933.

*L. T. Eddy,* for appellants.

*Hardin R. Harmer,* and *Victor H. Shaw, Ward Lanham, Ernest R. Bell,* and *K. C. Moore,* for appellees.

HATCHER, JUDGE:

In a general creditors' suit the undivided interest of M. Earl Morgan in real estate was subjected to certain judgment liens and this appeal followed.

M. W. Ogden negotiated the purchase (in 1927) from Standard Building & Loan Association of the "Glover Farm" of 89 acres, at the price of $16,541.38, plus the unpaid taxes for 1926. Ogden associated with himself in the purchase Homer Hawker, now deceased, M. Earl Morgan and M. A. Joliffe. Each of the four was to contribute one-fourth of the purchase price and each was to have a one-fourth interest in the farm. All of the purchase price except $8,000.00 was paid from the equal cash contributions of the four associates. The $8,000.00 was borrowed from the Farmers' Bank of Shinnston on a personal note signed by the four as joint makers, and paid over to the Association. (Since then the note has been reduced to $6,000.00 through equal payments by the four makers.) No deed was made, but there was an informal agreement between the four purchasers that the Association was to retain the legal title to the farm in trust to secure the payment by each one of his pro rata share (one fourth) of their joint indebtedness to the bank. The Association merely understood that it was to make the deed when and to whom Ogden said. The four purchasers never conferred jointly with each other or with' the Association. The whole affair was arranged by Ogden who conferred separately with each of his co-purchasers and separately with the Association. The circuit court ignored the informal trust agreement between the purchasers.

The appeal was taken by Ogden, Joliffe and representatives of Hawker. They contend (1) that the purchase of the farm was a joint adventure undertaken for the common benefit of all four purchasers; that the Bank of Shinnston is a creditor of the adventurers and has a prior right to be paid out of the assets of the enterprise (the farm); and that only the net amount of the interest of Morgan in the social property after the obligations of the venture are paid is liable to liens against him. (2) That the four associates became sureties, each for the other on the Bank of Shinnston note, and an equitable lien on the farm exists in favor of each, to protect him in

case he is called upon to pay the Bank more than one-fourth of the note.

1. The joint answer of Ogden, Joliffe and the representatives of Hawker (the appellants), avers in relation to the purchase of the farm: "* * * that Homer Hawker agreed to take one-fourth thereof; that M. A. Jolliffe agreed to take one-fourth thereof, and that Stella E. Morgan, through her attorney, M. Earle Morgan, agreed to take one-fourth and M. W. Ogden agreed to take the remaining one-fourth part thereof, and the sum of Eight Thousand Five Hundred Forty-one and 39/100 ($8,541.39) Dollars was provided in cash and in the proportion of one-fourth each." (The circuit court found that M. E. Morgan was acting for himself and not his wife, and that finding was not appealed.) The evidence of the respondents.is in line with their answer. A joint adventure is defined as "a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." Schouler' Pers. Prop. (5th Ed.), sec. 167a. There is no allegation or proof in this suit of community of interest. "The mere purchase of property by two persons each of whom contributes a portion of the purchase price makes them joint owners of the property, but does not establish between them the relation of joint adventurers." 33 C. J. 842. The theory of mutuality of interest is ingenious but inapt.

2. The answer of respondents (appellants) makes the following allegation relative to their second contention: " * * * it was agreed with all of the parties interested as purchasers that the title to said land should remain in the Standard Building and Loan Association until all of said borrowed money should be paid off and discharged, and that the title to each one-fourth interest in said land should remain in the Standard Building and Loan Association, to protect and guarantee the payment of its one-fourth of said note." The allegation is supported by the evidence, and is supplemented somewhat by the following testimony of Ogden: "The title (of the farm) was to be held by the Standard Building & Loan Association in trust to protect each person in their liability (one-fourth of the borrowed · money). * * * The title to the property

is being held to protect the purchasers, primarily to protect each of them against the other.''

The cash payment provided by Ogden and his associates was made to the Association about May 24, 1927, and the $8,000.00 procured from the bank was paid to the Association about June 27, 1927. From these facts counsel for the judgment creditors infer that the purchase of the farm was completed in May, and before the bank loan was made, and contend that the judgment liens attached to the interest of Morgan in May, and before the purchasers entered into their trust agreement as to the borrowed money in June. The testimony of Ogden (undisputed) is clear that Mr. Hawker had arranged with the bank to supply the $8,000.00 before the deal was closed. Consequently, we must regard the initial payment in May and the later payment (with the borrowed money) in June as but details of a prior completed arrangement to purchase the farm. Under that arrangement each purchaser was to acquire an equitable title to an undivided one-fourth interest in the farm; but the interest of every purchaser was to be subject to an equitable lien in favor of each of the other purchasers in case any one of them had to pay more than one-fourth of the borrowed money. The equitable lien attached to each equitable interest the moment the purchase was made from the Association. Both the right to the interest and the obligation of the lien are creatures of equity, and by equity are regarded inseparable as against prior judgments.

It is ancient law that a judgment lien is subject to any express equitable trust existing when the judgment lien attaches. This principle was recognized in England in 1715. See *Finch* v. *Winchelsea,* 1 P. Wms. 277. It was recognized in the United States in 1809 in *Delaire* v. *Keenan,* 3 Desaus. (S. C.) 74, which held: ''An imperfect agreement intended as a security will be supported as a mortgage even against judgment creditors.'' The principle was quickly developed by the following New York cases: *In re Howe,* 1 Paige Chy. 125, 128, decided in 1828; *White* v. *Carpenter,* 2 Paige Chy. 217, 266, decided in 1830; and *Kiersted* v. *Avery,* 4 Paige Chy. 1, 14-15, decided in 1832. The composite holding of those three cases is that a judgment lien is a general lien on all the estate

of a debtor, while an equitable claim is a specific lien on a particular property; the general cannot prevail over the specific lien if the latter existed when the former attached; and a court of chancery will limit the general lien "to the actual interest which the judgment debtor has in the estate." The state courts generally followed the New York cases, and they were specifically approved by the Supreme Court of the United States in 1868, in *Pierce* v. *Brown,* 7 Wall 205, 218. With this background of authority, Judge Green in 1880 (speaking for the majority of the Court) said in *Snyder* v. *Martin,* 17 W. Va. 276, 301: "It may therefore be laid down as a universal rule established by many cases, that a judgment lien is always subject to every possible description of equity held by a third party against the debtor at the time the judgment attached; and that it is immaterial, whether the rights of such third party consist of an equitable estate or interest in the judgment-debtor's land, an equitable lien on his land, or a mere equity against the debtor, which attaches to or affects his land." The rule has been recognized in many subsequent decisions of this Court. See *Smith* v. *Gott,* 51 W. Va. 141, 145, 41 S. E. 175, and *Westinghouse Co:* v. *Ingram,* 79 W. Va. 220, 226, 90 S. E. 837, and cases cited. Accord: 2 Freeman on Judgments (5th Ed.), sec. 950, and 2 Pom. Eq. Juris. (4th Ed.), sec. 721 and notes 1 and (a). Judge Green, *supra,* page 298, illustrates the rule as follows: "The right of the judgment-lien owner cannot exceed those which he might acquire by a purchase from the defendant with full notice of all existing legal and equitable rights belonging to third persons." Apply that test here: Had the judgment creditors purchased Morgan's interest with notice of his agreement with his associates, the purchase would have been subject to the agreement.

We therefore hold that the appellants, and each of them, have an equitable lien on the interest of Morgan in the Glover farm, for their protection *in re* his pro rata part of the balance due on the Bank of Shinnston note, and that their lien has priority over the judgments at law against him. The decree of the circuit court will be modified accordingly, and, as modified, affirmed.

*Modified and affirmed.*