PAULINE GELWICKS, *Executrix, etc.* v. H. C. HOMAN *et al.*

(No. 9221)

Submitted April 28, 1942. Decided June 30, 1942.

KENNA and LOVINS, JUDGES, dissenting.

*R. A. Welch*, for appellant.

*Emory Tyler, Lester Reynolds* and *Joseph E. Hodgson*, for appellees.

FOX, PRESIDENT:

Pauline Gelwicks, executrix of the estate of John D. Gelwicks, deceased, complains of a decree of the Circuit Court of Mineral County entered on the 18th day of November, 1940, dismissing her bill in a suit in which she was plaintiff and H. C. Homan and others were defendants, and prosecutes this appeal therefrom.

In the year 1921, the First National Bank of Keyser, a national banking association, conceived the idea of in-

creasing its capital stock from $60,000.00 to $80,000.00. The board of directors of said bank, elected at an annual meeting of the stockholders held on January 25, 1921, consisted of H. C. Homan, F. M. Reynolds, J. E. Patchett, H. G. Wilson, W. H. Markwood, George T. Carskadon, J. D. Gelwicks and R. M. Dean. On June 3rd of that year, a resolution was adopted by the directors in the words following:

> "Upon motion duly made and seconded a resolution was passed recommending to the stockholders to increase the capital stock of the Bank from $60,000.00 to $80,000.00. The stock to be sold at $160.00 a share to outside stockholders."

At a meeting of the stockholders held on June 18, 1921, the following resolution was adopted:

> "On motion made and seconded the action of the Directors was confirmed unanimously increasing the capital stock of the Bank from Sixty Thousand Dollars to Eighty Thousand Dollars. The additional stock to be sold to outside shareholders at $160.00 per share."

On the same date, the directors entered upon the minutes of their meeting the following:

> "It was a sentiment of the Board that the new stock be sold around to new people in small lots, the same to be passed on by the Board."

J. E. Patchett was not present at the directors' meetings, and there is nothing to indicate whether or not he was present at the stockholders' meeting of June 18th. Subsequent to these meetings, one hundred and forty shares of the stock issue authorized, were sold to various parties, leaving sixty shares unsold. On November 4, 1941, the following minute was made by the directors with respect to said shares:

> "It was agreed among the Directors to take up the stock remaining unsold, same to be distributed later to new stockholders."

At this meeting, all of the directors were present except J. E. Patchett and R. M. Dean. On December 2nd, following, the minutes of the meeting of November 4th were approved by the board of directors, all directors, except J. E. Patchett, being present, and at this meeting, the following was entered upon the record:

> "It was agreed that Mr. Gelwicks was to take up the unsold Bank stock and the other Directors were to sign an agreement assuming their pro rata share of any liability until the stock was placed in other hands."

We have, therefore, record proof that on November 4th, it was agreed among the directors present that the unsold stock should be taken up by the directors, and that this plan was changed to the one decided upon at the subsequent meeting of December 2nd, by which, instead of all the directors taking up the stock, it was agreed that Gelwicks should do so, and that the other directors were to enter into a written agreement assuming their pro rata share of any liability which might be created thereby. Both actions were taken under an agreement and understanding that the stock so taken up was to be later sold to new stockholders. The contemplated written agreement was never executed.

Following these meetings, Gelwicks executed to the First National Bank of Keyser his note for $9,600.00, and the proceeds of the same were used to pay for the sixty shares of stock which he had undertaken purchase under the resolution of December 2, 1921, and that sum became a part of the assets of the bank, and it issued to Gelwicks a certificate for said shares. It appears that possession of the certificate was retained by the bank, and that from time to time sales of stock were made, and in the aggregate twenty-five shares were sold, and the proceeds of such sales, with the exception of $100.00, were entered as a credit on the Gelwicks note of $9,600.00. Semi-annual dividends of 5% were declared on all outstanding stock, including that owned by Gelwicks, but as to the sixty

shares owned by Gelwicks, those dividends were retained by the bank in lieu of interest on the Gelwicks note. These dividends were regularly paid until January, 1931. The bank closed on March 4, 1933, and was never reopened, and later a receiver was appointed therefor. At the time of the closing of the bank, the Gelwicks note had been reduced to $6,100.00. There is evidence indicatthat $1,000.00 of this amount represented a new loan, which in nowise entered into the sale and purchase of the stock in question. Gelwicks was then the owner of thirty-five shares of the original block of sixty shares which he had purchased as aforesaid. After the closing of the bank, and in an effort to reopen the same, Gelwicks was induced to execute a deed of trust on real estate to secure the payment of the balance due on his note, and Emory Tyler was named trustee therein. After the closing of the bank and the execution of this deed of trust, Gelwicks was called upon to pay his note, and a sale of his property under the deed of trust was threatened; whereupon, Gelwicks instituted a suit in equity in the Circuit Court of Mineral County to enjoin the collection of said note or the sale of his property under the deed of trust, upon the general ground that in the purchase of this stock, for which the original note was executed, he was, in effect, acting as the agent of the First National Bank of Keyser, and that he was not personally liable on the note. The relief prayed for in this suit was denied, and, Gelwicks having died in the meantime, his executrix paid, not only the amount of said note, with interest, and costs of suit, but, in addition, a 100% assessment on the thirty-five shares of stock, the aggregate of the payments made by her on account of the note, stock assessment and costs being $12,829.71. The suit at bar was instituted to enforce contribution against the directors of the First National Bank of Keyser in office on the second day of December, 1921, who are now living, and against the personal representatives of those now deceased. A general demurrer to the bill on the part of all the defendants was overruled, but upon motion of J. E. Patchett, he was

dismissed from the suit on the ground that the bill did not show on its face that he had participated in any of the meetings, out of which, it is alleged, the liability of the other directors was created. It appears from the record that R. M. Dean, one of the directors, died many years ago, leaving no estate. It also appears that H. G. Wilson died, and that his estate has been fully settled, and had been distributed many years prior to the institution of this suit. It also appears that the estate of F. M. Reynolds has been fully administered, and that said estate was insufficient to pay the liens and charges against the same, and that no assets passed therefrom to his heirs.

The suit is prosecuted on the theory that there was a joint adventure entered into between Gelwicks and other members of the board of directors of the First National Bank of Keyser, by which the unsold shares of stock in said bank were to be subscribed and paid for by Gelwicks, and that any losses resulting therefrom should be shared pro rata by all of the directors.

Three outstanding questions are presented: (1) Was there such joint adventure; (2) if so, was it in violation of federal statutes and of such a nature as to prevent any character of relief to any of the participants; and (3) does the action of Gelwicks in the suit instituted by him, undertaking to absolve himself from liability on account of this transaction, estop him and his estate from recovery in this case?

The first question calls for some discussion of what constitutes a joint adventure. We cannot do better than quote from 30 Am. Jur., 677, which states that courts have not laid down any very certain or satisfactory definition of a joint adventure, but gives the following as some of the definitions thereof:

> "A joint adventure has been broadly defined as an enterprise undertaken by several persons jointly, and, more particularly, as an association of two or more persons to carry out a single business enterprise for profit. It has also been defined, somewhat variantly, as a special combina-

tion of persons undertaking jointly some specific adventure for profit, without any actual partnership or corporate designation; as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge; as a commercial or maritime enterprise undertaken by several persons jointly; and as a limited partnership, limited not in the statutory sense as to the liabilities of the partners, but as to its scope and duration."

Joint adventure is akin to partnership, and one of the distinctions is that, whereas, a partnership relates to a general business of a certain type, joint adventure relates to a single business transaction. *Kaufman* v. *Catzen,* 100 W. Va. 79, 130 S. E. 292; *Horn* v. *Holley,* 167 Va. 234, 188 S. E. 169; *Dexter & Carpenter* v. *Houston,* 20 Fed. 2d 647. When set up, a fiduciary relationship is established among the interested parties, and the same rights and duties are created and imposed as if a technical partnership existed. Independent of any express agreement, the parties are entitled to share in the profits of the enterprise and in the liability for losses. 30 Am. Jur., 693. If one member of the adventure sustains losses, he is entitled to contribution from his fellow-adventurers, and will be required to account to them for any profits he may receive personally. The utmost good faith is required on the part of all concerned. *Berry* v. *Colborn,* 65 W. Va. 493, 64 S. E. 636, 23 L. R. A. (N. S.) 522; *Dexter & Carpenter* v. *Houston, supra;* 30 Am. Jur. 699.

Did the directors present at the directors' meeting held on December 2, 1921, embark upon a joint adventure? This question must be answered solely from the record of the meetings of the stockholders and board of directors from which we have quoted above. The evidence of Harry L. Arnold, who was cashier of the bank at the time of its closing, and for some time before, adds nothing to the picture. From this record, it is clear that the board of directors had two propositions in mind: (1) to increase the capital stock of the bank, and (2) to

distribute the stock authorized by such increase among new stockholders. Being stockholders of the bank, the advantage accruing to them as stockholders by the sale of stock to outside persons is apparent, and furnishes the consideration for what they finally did. The purpose they had in mind was carried out in part, in that at some time between June 18, 1921, and November 4th of that year, they had sold and distributed one hundred and forty shares of the authorized increase of stock. On November 4th, it was agreed among the directors that they would take up the remaining stock and distribute the same among new stockholders. For some reason they changed this plan, and on December 2nd, decided that, instead of the directors taking up the stock, the same would be taken up by Gelwicks, and that the other directors would assume their pro rata share of the liability which might result therefrom. This meant nothing more than that Gelwicks was to advance the purchase price of the stock, and hold the same subject to the control of the board of directors as to its later distribution, and it was contemplated that he would sell the same, as opportunity afforded, to new stockholders. Apparently no thought of profit from the transaction entered the mind of the parties, but it was contemplated that there might be losses, and certainly there were liabilities and risks of loss created thereby. Gelwicks' money or credit was at stake to the full amount of the purchase price; the stock might decline in value and have to be sold at a loss; dividends might be passed, while interest on the amount borrowed to make the investment would accumulate; and finally, there was the risk of stock assessments. This being true, the directors being as one in the purpose they had in mind, undertook to share with Gelwicks the several risks involved. We think this amounts to a joint adventure, supported by a sufficient consideration, and that the rules of law applicable to a joint adventure apply. A transaction very similar in its terms was held to be a joint adventure in *Chisholm* v. *Gilmer*, 81 Fed. 2d 120.

But it is said that what the parties did was in violation

of the federal statutes governing national banks. It is contended that Section 83, Title 12, U. S. Code, Annotated, covering banks and banking, makes the transaction illegal, and that no affirmative rights thereunder accrued to any one who participated therein. The statute referred to reads as follows:

> "No association shall make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith; and stock so purchased or acquired shall, within six months from the time of its purchase, be sold or disposed of at public or private sale; or, in default thereof, a receiver may be appointed to close up the business of the association. * * *."

We recognize and approve the many cases decided by this Court that a plaintiff may not recover under a contract tainted with fraud, the violation of a statute, or which is contrary to public policy, where his participation therein is shown. It would serve no good purpose to cite and discuss these cases, for the principle is well established. Nor do we question the soundness and force of the many decisions which hold illegal agreements which tend to violate the section quoted above. *Harriman National Bank* v. *Perry*, 86 Fed. 2d 641; *Longley* v. *Coons*, 244 App. Div. 391, 280 N. Y. S. 17; *Jackman* v. *Continental National Bank*, 16 Fed. 2d 728, 51 A. L. R. 336; *Anderson* v. *Akers*, 7 Fed. Supp. 924; *First National Bank* v. *Lanier*, 11 Wall. 369, 20 L. Ed. (U. S.) 172; *Harper* v. *Crenshaw*, 65 App. D. C. 239, 82 F. 2d 845, 102 L. R. A. 362; *Deitrick* v. *Greaney*, 23 Fed. Supp. 758, cited by appellants to illustrate this point. This principle is also supported by *Raleigh County Bank* v. *Bank of. Wyoming*, 100 W. Va. 342, 130 S. E. 476.

But we are not persuaded that the transaction involved in this suit violates the statute in question. In construing a statute, the purpose and intent of the legislative body is always a safe guide, and so far as possible, will

be followed. The evident purpose of the statute was to guard against the ownership of its own stock by a national banking association, or the loaning of money thereon, which would, in many cases, result in the association having to acquire the stock. In this case, if the stock in question was, in fact, acquired by the bank and not by Gelwicks, then the transaction was plainly illegal. But is the case before us of that character? There were sixty shares of stock unsold, which the directors wanted to see distributed among new stockholders. They first decided to take up the stock themselves, not for the bank, but individually; and later concluded that they would accomplish the same purpose by having one of their number take up the stock, and guarantee him against their pro rata share of any loss by reason thereof. With that understanding, Gelwicks subscribed for the stock and paid for it; it became his property, with all of the risks and liabilities which attached to his ownership. The fact that he borrowed the money from the First National Bank of Keyser is not important, in view of the fact that he is shown to have been a man of means, well able to purchase the stock as an investment, which is fully established by the fact that his estate, not only paid the note in question, but more than $4,400.00 in addition, representing a stock assessment, and interest. We cannot see that the banking authorities had any reason to complain of the transaction, because, as a result thereof, all of the stock of the bank had been issued and paid for, and the bank, in holding Gelwicks' note for $9,600.00, was fully protected as against liability on account of the issuance of the stock to him. That the federal banking authorities had no reason to complain of the transaction is evidenced by the fact that it was never called into question over the eleven years which intervened between the date thereof and the closing of the bank, during which time, it may be assumed, such authorities made regular examinations of the bank, as federal statutes require. While the certificate for the stock was left with the bank cashier, it seems clear that that course was followed because it

was contemplated that Gelwicks would hold the stock subject to his agreement to sell the same to new stockholders, and in no sense as collateral for a loan. When sales were made from time to time, the certificate originally issued was cancelled and re-issued to Gelwicks for a smaller number of shares, depending on the number sold. This was merely carrying out the understanding originally had that the stock was to be distributed to new stockholders. We do not think that understanding in anywise affects the legality of the original sale of stock. Gelwicks, when he executed his note to the bank, was liable for the interest thereon. If, instead of collecting his dividends and paying interest, he permitted those dividends to be applied, and if the dividends were equal in amount to the interest which accumulated on the note, the bank was in nowise prejudiced. We see nothing in this transaction other than the subscription by one director to the capital stock of the bank, the payment of that subscription in full, and a side agreement which, in nowise prejudiced the bank or its stockholders, by which he agreed to permit the stock purchased by him to be afterwards sold to new stockholders. Whatever may be said about the subsequent litigation, in which it was sought to place a different construction thereon, the result of that litigation was to establish that when Gelwicks purchased this stock he became the owner thereof, subject to all of the risks and liabilities attached to such ownership. In other words, the effect which we give to the transaction in this opinion, has already been determined by a court of competent jurisdiction.

It is clear that Gelwicks did undertake to evade his responsibility in connection with the purchase of this stock. He filed a suit in the Circuit Court of Mineral County, in which he made the claim that he was not personally bound by the transaction, in which the stock in question was issued to him; that he should not be required to pay the balance due on the note which, it was assumed, represented a part of the $9,600.00 note originally executed, remaining unpaid. That issue was de-

cided against him, and his estate was not only required to pay the balance due on this note, but the assessment on the stock, with interest, was also enforced.

It is contended that by taking this position, Gelwicks' executrix is now estopped from asserting any ·claim to contribution from the defendants. It is contended that the rule that "parties will not be permitted to assume successive inconsistent positions in the courts of a suit or series of suits in reference to the same fact or state of facts," applies, and many cases are cited in support of this statement, including *McDonald* v. *Long,* 100 W. Va. 551, 131 S. E. 252; *Clay County Bank* v. *Wilson,* 109 W. Va. 684, 158 S. E. 517; *Litz v. First Huntington National Bank,* 120 W. Va. 281, 197 S. E. 746. Many other cases along the same line could be cited. We think, however, that this rule, based as it is on the doctrine of estoppel, is only applicable where the taking of such inconsistent positions operates to the prejudice of those against whom they are taken. One may not defend a suit upon one ground, and then later defend the same suit or one growing out of the same transaction, on grounds separate and distinct from those formerly asserted, and inconsistent therewith, but this case is not of that character. The position taken by Gelwicks in his suit, in which the defendants in the present suit were not parties, and in which he sought to avoid liability on account of his stock purchase, in nowise prejudiced the defendants in this suit, and, therefore, no estoppel can arise therefrom in their favor. In fact, if he had sustained his position in that suit, it would have inured to their benefit, because there would have been no liability against Gelwicks or his estate, and nothing upon which a claim for contribution could have been based. The position taken by Gelwicks in the former suit was untenable for many reasons, one of which is that if his factual contentions therein had been established, a plain violation of the federal statutes, precluding relief, would have been shown. When he lost that suit, and his executrix prosecutes the present suit on the assumption that the transaction in question was one of joint adventure, out of

which she may demand contribution from her decedent's co-adventurers, she undoubtedly assumed a position inconsistent with that assumed in the first litigation, but that contention was not prejudicial to the defendants in the present suit, but in their interest. We think it would be inequitable to say that, in such circumstances, the efforts of Gelwicks to escape liability, and thereby wipe out any basis for contribution, should now be attacked by those whose interest would have been served had he been successful, as barring his right to contribution, based upon what a court of competent jurisdiction held to be the true effect of the transaction here involved. We think Gelwicks had the right to make the contentions he made in his former suit, without losing any right he might have against his co-adventurers, should his suit fail. Without in any way meaning to weaken the force of the several decisions last cited above, we do not think that they should be applied to this case. Every general rule has its exception, and those exceptions arise when the enforcement of such rule would entail inequities.

The trial court dismissed J. E. Patchett from the suit because there was no allegation that he was present at any of the meetings of the directors in which these transactions were considered. The liability of these directors depends entirely upon whatever agreement was finally entered into, and we cannot bind parties not present and participating in that agreement, or whose ratification thereof is not shown. We think, therefore, there is no error in the court's action in that regard.

Other questions are raised in the case as to the liability of the estates of Harry G. Wilson and F. M. Reynolds, growing out of the allegations that these estates have been administered, and that no liability can now attach either to the estates, or the heirs or distributees thereof, as well as question of whether the note paid to the bank by the plaintiff covered loans other than that involved in the original stock purchase. The trial court did not pass upon these questions because it held that plaintiff was not entitled to any relief, making it unnecessary to make any fur-

ther finding. The trial court not having decreed thereon, we will not do so. The case will have to be remanded to the Circuit Court of Mineral County, and on remand, such questions can be taken up and decided.

We are of the opinion, first, that the plaintiff's decedent and the other directors of the First National Bank of Keyser, except J. E. Patchett, entered into a joint adventure on the 2nd day of December, 1921, with respect to the sixty shares of stock then purchased by Gelwicks; second, that the purchase of said stock, in the circumstances, was not in violation of any of the federal statutes pertaining to national banking associations, or in violation of any rule of law; and third, that the inconsistent positions involved in the suit instituted by Gelwicks in the Circuit Court of Mineral County, seeking to be relieved of any liability on account of said stock purchase, cannot now be relied upon by the defendants to relieve them of their responsibility growing out of the joint adventure; and so holding, the decree of the Circuit Court of Mineral County will be reversed and the cause remanded for further proceedings.

*Reversed and remanded.*

KENNA, JUDGE, dissenting:

I doubt whether this transaction can properly be treated as a joint adventure for the simple reason that it was not formed for the purpose of profit, (see *Springston* v. *Powell,* 113 W. Va. 638, 169 S. E. 459) but simply for the purpose of seeing that the additional stock of The First National Bank of Keyser was properly distributed to "those parties" who would add to the stability of all of the stockholders, and, perhaps incidentally, not be hypercritical of the existing officers and board of directors. There being no pecuniary profit involved, I believe the joint understanding by the directors could be more accurately designated as a joint business trust, Gelwicks acting as trustee and providing the necessary capital.

Passing the question as to the nature of the agreement, I am convinced that its effect was plainly a substantial

violation of Title 12, Sec. 83, U. S. C. A., cited and quoted in the majority opinion, and being so cannot furnish a basis for equitable relief, but creates a situation in which the parties are to be left where they are found by a court of chancery.

A perusal of the majority opinion at once discloses that the increasing of the capital stock of The First National Bank of Keyser in 1921 was a rather loosely-conducted proceeding. Neither the proceeding of the directors nor that of the stockholders mentioned the par value of the additional shares or their number, and the Federal Act must be turned to in order to ascertain that the increase in capital stock from sixty to eighty thousand dollars represents the issuance of two hundred additional shares of a par value of one hundred dollars each, so that fixing the selling price at one hundred and sixty dollars a share carried with it a premium of sixty per cent.

Until November 4, 1921, the stockholders and directors of the bank were managing and directing the issuance and sale of the additional stock with decided informality, but without definite departure from permissible methods. On that day the directors agreed to "take up" the stock remaining unsold, being sixty shares, to be distributed later to new stockholders. This understanding appears from the official minutes of its directors' meetings. Of course, the directors could not have been acting for the bank, but under the circumstances their course of conduct could have affected only themselves as individuals. Otherwise it would have been a plain violation of Sec. 83 of Title 12. Yet it is apparently plain that it was not the directors' purpose to make a profit, and that they did believe they were acting for the common protection of all of the bank's existing stockholders. It will be noted that there was no method of procedure mentioned in the resolution of November 4th to govern the taking up of the stock by the individual directors, so that at the next meeting on December 2nd, in order to have Gelwicks take up the unsold stock, the other directors agreed to sign an agreement assuming their pro rata share of any liabil-

ity that might be incurred before the stock was placed in other hands. The understanding was entirely personal between the individual directors, and yet the only evidence of their understanding is found in the minutes of the bank's board of directors. The written agreement was never executed, but Gelwicks promptly procured ninety-six hundred dollars from the bank, it not being directly shown that this was done pursuant to the understanding between him and the other directors of the bank that he should "take up" the unsold sixty shares; but it is extremely unlikely that even at the instance of a director the bank would loan, especially upon unsecured paper, a sum equivalent to almost one-sixth of its outstanding capital stock. Certainly that would not occur upon an unindorsed and unsecured note of that amount.

It should be constantly borne in mind that under the Federal statute The National Bank of Keyser was required to procure the sanction of the Comptroller of the Currency before putting into effect the increase of its capital stock, and before receiving that approval was obliged to sell and to be fully paid for the additional shares. Barnes' Federal Code, 1919, Sec. 9170; Revised Statutes, Sec. 5142. The bank had sold and received payment for one hundred and forty shares and, instead of segregating the purchase money until all the additional stock was sold and paid for and the approval of the Comptroller of the Currency was procured, it had increased its working capital as and when payments were received. Consequently, as the bank approached the first of the year 1922, it found itself confronted by the necessity of reporting its condition and disclosing a non-compliance with the statutory requirements, or in some way disposing of the sixty remaining shares, and, at least in form, complying with the statute. Naturally, the directors chose the latter alternative.

When Gelwicks paid to the bank the entire purchase price for the original issue of the sixty shares of its stock, which the bank was selling to him for himself and the decided majority of its board of directors, the certificate

representing those shares was not delivered to him. It was issued in his name, indorsed in blank by him, and left entirely in the custody and control of the bank. The semi-annual dividend thereafter was received by the bank and was applied by it to discharge the interest payable upon what it knew to be Gelwicks' purchase money note, the remaining part of the dividend being applied to the note's curtailment. When small blocks of the sixty shares were sold, Gelwicks did not enter into the transaction. The bank sold them. The bank caused certificates to be issued to the buyers, and the shares deducted from Gelwicks' stock account. The purchasers were not conscious of the fact that they were buying shares that stood on the bank's stock book in the name of Gelwicks. So we have here the picture of Gelwicks borrowing ninety-six hundred dollars from The First National Bank of Keyser and simultaneously with its receipt executing his ordinary promissory note, and arranging for the bank to receive the custody and entire control of the sixty shares of its own stock purchased with its own money, Gelwicks being nothing more than a formal figurehead. It may be that his credit-rating was quite good, but it is significant that the bank did not rediscount his paper.

I do not agree with the reasoning of the majority opinion to the effect that the purpose of Title XII, Sec. 83, is to prevent a national bank from purchasing its own stock. Of course, being expressly prohibited, that is one of its purposes. However, that section goes considerably beyond that one inhibition. It definitely forbids making "any loan or discount on the security of the shares of its own capital stock * * *." Note the use of the phrase "on the security of," and that the effect of the section is not limited to the acceptance of its capital stock as collateral. The section under consideration not being penal, I believe should be broadly construed, and if it were necessary to determine the legislative purpose in order to arrive at a construction of its meaning, which I am of the decided opinion it is not for the reason that ambiguity is entirely lacking, I should still say that its definite pur-

pose is to prevent the use of the bank's funds by its officers in control thereof to manipulate or in any way control, directly or indirectly, the voting power of its outstanding stock, thus undermining the free use of independent judgment by its officers. The history of our banking institutions, I think, fortifies this conclusion.

I believe that it cannot be questioned that this record by direct proof and inescapable inferences clearly shows that The First National Bank of Keyser knowingly invested ninety-six hundred dollars of its cash on hand in its own common stock. The stock was purchased in the name of Gelwicks, it is true, and for that reason the conclusion of the majority that the bank did not *purchase* its own stock is probably maintainable. The fact, however, remains that simultaneously with advancing the purchase price, the bank took over the complete and absolute control of the purchased shares, which it unlimitedly exercised, regardless of Gelwicks other substantial property holdings, recognizing quite clearly that the transaction was not for the benefit of Gelwicks alone, but included as well others with an equitable interest, along with him, in the *res*. I think, therefore, that the bank made a loan on the security of the shares of its own capital stock in violation of Sec. 83 of Title 12 of the United States Code Annotated, and that Gelwicks was in *pari delicto* with the other directors, and that he is thereby precluded in a court of chancery from recovering a contribution from those who acted with him in the resultant loss.

There is another matter, which, according to the showing of this record, I believe to be incidental, and this is that at the time of the loan of the ninety-six hundred dollars the approved outstanding capital stock of The First National Bank of Keyser was sixty thousand dollars, although one hundred and forty additional shares had tentatively been sold. The amount of its earned surplus was thirty thousand dollars. The Federal Act prohibits a loan in excess of ten per cent of a national bank's outstanding capital stock plus ten per cent of its

surplus. At the time of the loan, therefore, that statute was also violated.

The further question is to what extent, if at all, the complete change of face by the plaintiff in this proceeding, as compared with the position taken by Gelwicks in the proceeding brought against the bank in his lifetime, operates as an estoppel. In the former proceeding the trial court held that Gelwicks had failed to show a purchase by The First National Bank of Keyser, and since his recovery was based upon that theory, the former proceeding, after a full hearing, was dismissed. His executor now takes the position that The First National Bank of Keyser played no part directly in the purchase, but that it was a joint adventure between Gelwicks and the directors who attended the proceeding, the minutes of which recite a private understanding between Gelwicks and those present. Beyond affecting the credibility of witnesses, I do not see how such a change of position could operate directly upon the executrix. The parties here are different. Obviously, it cannot be treated as *res adjudicata*, and, as pointed out in the majority opinion, there has been no subsequent change of position upon the part of any single defendant to justify treating it as an estoppel. Of course, contradictory written statements and declarations made in the former proceeding may be regarded as declarations against interest, if material, but that question is not now before us.

For the foregoing reasons I would affirm the trial chancellor and dismiss the cause here.

Judge Lovins joins in this dissent.