Eugene C. Hartman and Louise W. Hartman (Husband and Wife) v. Commissioner.
Hartman v. Commissioner
Docket No. 62162.
United States Tax Court
T.C. Memo 1958-206; 1958 Tax Ct. Memo LEXIS 19; 17 T.C.M. (CCH) 1020; T.C.M. (RIA) 58206; December 9, 1958
*19 George Shedan, Esq., for the petitioners. Vernon R. Balmes, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income tax of the petitioners for the years 1951 and 1952 in the amounts of $5,215.46 and $541.36, respectively. The questions presented are whether (1) the arrangement entered into between the Parkersburg Transit Company, R. D. Lattimer, and petitioner, Eugene C. Hartman, for the operation of a ferry across the Ohio River constituted a joint venture within the meaning of section 3797(a) (2) of the Internal Revenue Code of 1939, and (2) the petitioner is taxable upon his share of the undistributed net income from the operation of the ferry in the taxable years 1951 and 1952. Findings of Fact Petitioners are husband and wife residing at 2001 Park Avenue, Parkersburg, West Virginia. They filed joint returns for the periods involved with the collector or district director of internal revenue at Parkersburg, West Virginia. Eugene C. Hartman will be hereinafter referred to as petitioner. The Parkersburg Transit Company, a West Virginia corporation, hereinafter referred to as the Transit Company, *20 primarily operated buses between Parkersburg, West Virginia, and the cities of Belpre and Rockland, Ohio. Parkersburg and Belpre were connected by a bridge across the Ohio River commonly designated "Parkersburg-Belpre Bridge" over which the Transit Company routed its buses. On February 26, 1951, the Parkersburg-Belpre Bridge was condemned and closed to all traffice. Donald F. Black, Secretary and Treasurer of the Transit Company made various attempts to have the State Road Commission of West Virginia and the Department of Highways of the State of Ohio install a ferry across the Ohio River without success. Black located a barge in Pittsburgh, Pennsylvania, owned by the Crane Brothers. He took a boat repairman to view the barge who advised him that it could be put in operating condition for around $4,000. The Transit Company was not in a financial position to place the ferry in operation. Black contacted petitioner about advancing the sum of $5,000 to finance the project. Petitioner interested R. D. Lattimer in the proposition made by Black. Black drafted an agreement which after some discussion was amended by the addition of the "Seventh" paragraph. The agreement dated March 12, 1951, executed *21 by all the parties reads as follows: "THIS AGREEMENT, Made and executed in duplicate this the 12th day of March, 1951, by and between the Parkersburg Transit Company, a corporation, of Parkersburg, West Virginia, as parties of the first part, and E. C. Hartman and R. D. Lattimer, as parties of the second part. "WITNESSETH: That for and in consideration of the mutual covenants and promises herein contained, the parties hereto do covenant, promise and agree to and with each other as follows: "First: The said parties of the second part do hereby deliver to the said party of the first part the sum of Five Thousand ($5000.00) Dollars in cash, the receipt of which is hereby acknowledged by the said party of the first part. "Second: The said party of the first part doth agree to use said sum of money for the purpose of obtaining, repairing and insuring, and placing in service a ferry between Parkersburg, West Virginia, and Belpre, Ohio, across the Ohio River. "Third: The said party of the first part agrees to manage the operation of said ferry and to account in full to the said parties of the second part for all receipts and disbursements incident to the operation thereof, and to *22 pay to the said parties of the second part all of the net profits accruing from the operation of said ferry until the aforesaid sum of Five Thousand ($5000.00) Dollars, with interest thereon at the rate of six per cent (6%) per annum has been returned in full to the said parties of the second part, and, thereafter, to pay to the said parties of the second part one-half (1/2) of all net profits realized from operation of said ferry. "Fourth: The services to be performed by the said party of the first part shall include those of obtaining proper certificates of Public Convenience and Necessity from the Public Service Commission of the State of West Virginia, and the Interestate Commerce Commission of the United States of America, and all other matters incident to the operation and maintenance of said ferry. "Fifth: An accounting shall be rendered between the parties hereto on the first day of each month after the date of this agreement and the books and records pertaining to the operation of said ferry shall be open to the inspection of all parties to this agreement at all times. Sixth: The said party of the first part does hereby grant and give unto the said parties of the second *23 part an equal, undivided one-half interest in all rights accruing to them by virtue of an agreement of even date herewith between the said party of the first part and Crain Bros., Inc., a corporation, of Pittsburgh, Pennsylvania, a copy of which agreement is attached hereto and made a part hereof. "Seventh: The aforesaid sum of Five Thousand ($5,000.00) Dollars shall be considered as a loan from the parties of the second part to the party of the first part but the party of the first part shall not be required to pay the same to the parties of the second part except in the manner herein provided. "WITNESS the following signatures and seals. "PARKERSBURG TRANSIT COMPANY, a Corporation, By: s/ Donald F. Black (SEAL) Secretary-Treasurer. s/ E. C. Hartman (SEAL) s/ R. D. Lattimer (SEAL)" The Transit Company kept separate accounts as to the fares and expenses of the ferry operations. The moneys derived from the operations of the ferry were deposited by the Transit Company in a special "ferry" account and were not commingled with its receipts from bus fares. Petitioner and Lattimer borrowed $5,000 from the Parkersburg Savings and Loan Company and executed their note therefor *24 on March 12, 1951. The check of the loan company which was payable to petitioner and Lattimer, was endorsed by them and delivered to the Transit Company. Neither petitioner nor Lattimer received any promissory note from the Transit Company. Subsequently, the sum of $18,000 was borrowed by the Transit Company from the Peoples Banking and Trust Company of Marietta, Ohio, Belpre Branch, on a note dated March 16, 1951. The note was endorsed by officials of the Transit Company, petitioner, and Lattimer. The loan could not have been obtained without the endorsement of petitioner and Lattimer. On or about June 8, 1951, the Transit Company paid to the Parkersburg Savings and Loan Company the $5,000 with interest on the note which petitioner and Lattimer had executed and delivered to the Parkersburg Savings and Loan Company under date of March 12, 1951. During July and August 1951, the Transit Company paid $18,000 to the Peoples Banking and Trust Company of Marietta, Ohio, on the note of March 16, 1951, in that amount. The payment of the $5,000 and the $18,000 notes were paid from ferry operation profits. On or about June 2, 1951, Lattimer assigned his equity in the contract to his daughter *25 and son-in-law, John F. and Patricia Learman. Lattimer did not consult or obtain the consent of the Transit Company or the petitioner to such assignment. Lattimer did not receive any cash distributions from the ferry operations, but he paid income taxes on his distributive share of the income from such operations for the period from March 12, 1951 to June 2, 1951, the date of the assignment. In 1952, when the bridge was again opened for traffic, the operation of the ferry was discontinued. Acting through its duly authorized agents the Transit Company filed partnership returns of income for an organization composed of "Learman, Hartman, and Parkersburg Transit Company" for the years 1951 and 1952. In each such return the organization was designated as a joint venture and the principal business activity was stated as "Operation of a Ferry." In the joint return for the taxable year 1951, petitioners reported as other income the amount of $11,700 received from the Transit Company. In the taxable year 1952 petitioners did not report any income from the Transit Company. In the deficiency notice, the Commissioner determined that under the agreement of March 12, 1951, petitioners *26 had taxable income in the amount of $21,882.75 in 1951, and $1,127.83 in 1952, and increased their income by the amount of $10,182.75 in 1951, and by the amount of $1,127.83 in 1952. In executing the agreement of March 12, 1951, it was the intention of the parties to engage in the operation of a ferry as a joint venture. Opinion LEMIRE, Judge: The primary question is whether under the agreement of March 12, 1951, entered into by petitioner, R. D. Lattimer, and the Parkersburg Transit Company, the parties intended to engage in the operation of a ferry as a joint venture during the years 1951 and 1952. Petitioner contends that his relation to the project was that of a creditor and that no partnership or joint venture was intended. Respondent contends that petitioner was a member of a joint venture having the characteristics of a partnership for Federal income tax purposes and that petitioner is liable for his share of the profits earned whether or not distributed to him. By section 3797(a)(2) of the Internal Revenue Code of 1939 a joint venture is included in the definition of a partnership. *27 A joint venture has been defined as a special combination of two or more persons where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation. Tompkins v. Commissioner, 97 Fed. (2d) 396. A similar definition is found in Gilvicks v. Homan, 124 W. Va. 572, 20 S.E. (2d) 666. The question as to whether a partnership or a joint venture such as we have here exists, depends upon whether the parties intended to join for the purpose of carrying on a business and sharing in the profits or losses. The intention is a question of fact to be determined from the evidence disclosed by their agreement, their conduct in carrying out its provisions, their statements, the testimony of disinterested persons, and any other facts throwing light on their true intent. Commissioner v. Culbertson, Sr., 337 U.S. 733. The written agreement of the parties is set forth in full in our Findings of Fact. Petitioner relies upon *28 the "Seventh" paragraph of the agreement which, in substance, recites that the amount of $5,000 was to be considered as a "loan" in support of the contention that the parties intended the relation of debtor and creditor. Of course, the mere fact that the agreement itself recites that the money advanced was a loan would not make it so if the other provisions of the agreement clearly indicate otherwise. The Court is not bound by the disclaimer of a partnership or joint venture in determining the true relationship. It is free to go behind the characterization in the agreement describing the advance as a "loan" to find something other than a debtor and creditor relationship exists. The contract must be judged by its true character rather than by the form or color which the parties have seen fit to give it. For a true loan it is essential to provide for repayment absolutely and in all events, or that the principal be secured in some way as distinguished from being put in hazard. In re Grand Union Co., 219 Fed. 353 certiorari denied sub nom. Hamilton Investment Company v. Ernst, 238 U.S. 626; *29 National Bank of Paulding v. Fidelity and Casualty Company, 131 Fed. Supp. 121, 123. The Third paragraph of the contract clearly provides that the reimbursement of the money advanced is to be made only out of the net profits from the operation of the ferry. The witness, Black, testified that the Transit Company assumed no obligation to repay the money advanced. The Second paragraph of the agreement shows that the money advanced was not to the Transit Company generally, but was limited to the purpose of obtaining, repairing, insuring, and placing in service a ferry. The Transit Company executed no promissory note evidencing a loan. The oral testimony shows that the Transit Company was in financial difficulty and lacked credit facilities, and it appears that petitioner and Lattimer did not desire to enter into a general partnership relationship with the Transit Company and become responsible for all its debts. It is not unlikely that the purpose of the addition of paragraph "Seventh" of the agreement as orginally proposed by Black, on behalf of the Transit Company, was to limit the loss as between the parties to the $5,000 advanced. It is entirely competent for *30 the parties to so agree. 47 C.J. 672, sec. 64(2)(a). Petitioner further contends that no partnership or joint venture existed because the Transit Company had full control of the operation of the ferry; and that Lattimer assigned his interest in the contract without the consent or knowledge of petitioner. It is well settled that a partner or joint adventurer may intrust performance to another. E. A. Landreth Co., 11 B.T.A. 1; Estate of L. O. Koen, 14 T.C. 1406. A joint adventure continues notwithstanding a member assigns his interest therein or dies. Kaufman v. Catzen, 100 W. Va. 79; 132 S.E. 292; Gilvicks v. Homan, supra. We are not persuaded that the instant case is one where money is advanced with a division of the profits as compensation for the loan. The record indicates a proprietary interest in the profits as profits. We think the fact that petitioner and Lattimer, after the ferry had been placed in operation, became endorsers on a note of the Transit Company for the amount of $18,000, which note was paid out *31 of the revenues obtained from the operation of the ferry, is further evidence of their proprietary interest in the venture. Where the party receiving the money assumes no obligation for its return and it is subject to the hazard of the business, the parties have been generally held to be joint venturers notwithstanding the money is to be repaid with interest before the net profits are to be divided. 48 C.J.S. 805, Joint Adventures, sec. lb(2). That is the situation in the instant case. After a study of the agreement and consideration of all the facts and circumstances revealed by the record, we are convinced that the parties intended to create a relationship far more comprehensive than the usual and ordinary relation which exists between a creditor and a debtor. The parties had a joint interest in the property not amounting to a technical partnership, but to a joint venture. Petitioner, on brief, states "there is a remote possibility that the arrangement constituted an association defined as a corporation under section 3797(a)(3) of the Internal Revenue Code. *32 " No issue that it should be taxed as a corporation is alleged in the pleadings. Frank Polk and Marie Polk, 31 T.C. - (Nov. 18, 1958). The burden is upon petitioner to overcome the Commissioner's determination which treats the contract here involved as constituting a joint venture. The Lesavoy Foundation, 25 T.C. 924, reversed on other grounds, 238 Fed. (2d) 589. Petitioner has not carried his burden. Petitioner further contends that being on a cash basis he is taxable only on the cash distributions received from the enterprise. Since we have held that petitioner was a member of a joint venture, taxable as a partnership, the income from the venture is taxable to the members in the year earned and not the year when the actual distribution is made. Section 182 of the 1939 Code so provides. Beck Chemical Equipment Corp., 27 T.C. 840; James F. Curtis, 3 T.C. 648. The amounts involved are not in controversy. Decision will be entered under Rule 50.