# 𝔚𝔶𝔱𝔥𝔢𝔟𝔦𝔩𝔩𝔢

GEORGE HENRY MOLTZ v. MADELINE LAURA MOLTZ.

June 22, 1944.

Record No. 2803.

Present, All the Justices.

The opinion states the case.

*Thomas I. Talley, Thomas A. Williams* and *L. C. O'Connor*, for the appellant.

No appearance for the appellee.

Holt, J., delivered the opinion of the court.

Plaintiff and defendant were married on August 8, 1942. The bride represented herself as being an unmarried woman —Madeline Laura Johnson. As a matter of fact, she had been married to John Kellner. That marriage took place on November 12, 1931. She lived with him for three days and was afterwards divorced.

She told Mr. Moltz before marriage that she had been married to a man named Wayne Clarke. In her deposition she says that Mr. Clarke was only her "boy friend." She introduced him to others as her husband. She borrowed money under the name of Madeline Clarke, and a letter written to Mrs. Wayne Clarke in South Carolina was received because it was answered.

These facts have no direct bearing upon the issues here though they may be considered when we come to weigh her testimony.

The marriage took place in Richmond, which was at that time the home of the contracting parties. About a month after this marriage, the husband went into or was drafted into the Navy and was stationed at Norfolk. On weekends he would come to Richmond to see his wife. His evidence is that she would, on these occasions, sometimes make it convenient to be out of town, or, in any event, not at home. This she denies.

He gave her an automobile; he gave her a life insurance policy taken out on himself when he was eighteen years old, and he gave to her allotments, etc., amounting to $50.00 a month. She did not want to live in Norfolk and told his mother "that I thought it was foolish for me to go down there when I had a job here because I didn't know how long he would be stationed in Norfolk, and that if he would pull out, what would I get."

Matters were not satisfactory. She corresponded with other men. Back in her mind was another divorce. She

consulted a lawyer and was evidently told that she had no case. It may be that her lawyer advised her what to do—at any rate she wrote to her husband:

"A. I wrote and told him that the only way I could get a divorce from him was for him to get caught in a cabin with another woman; that if he wanted a divorce so bad that was the only way he could get one."

In the vernacular, something in the nature of a showdown came about on the afternoon of November 29, 1942. Mr. Moltz, his wife and her sister-in-law then came to his mother's home. This husband and wife, to thrash out their differences, went into a bedroom adjoining the sitting room. These people also were present there: Mrs. Ancarrow, Mrs. McGruder, Mr. McGruder and his brother, Charles Moltz, and Mr. McGruder's sister and her husband and Mr. Ancarrow. This is the husband's account of what then occurred:

"A. That afternoon I did see her at my mother's house, I left my mother's house and went out in the car. I had my sister, two brother-in-laws and my niece and my sister's sister-in-law and her husband. We went out riding and came back about 3:30 I think it was. When I got to my mother's house my wife and her sister-in-law were there. My wife said she wanted to talk to me, she would not talk to me in the living room and suggested that we go into the bedroom. I went into the bedroom with her and asked her to come to Norfolk to live where I could see her, because she was living at her brother's house after moving from her mother's house without telling me where I could see her at. Her brother told me to stay away from his house and her step-father told me to stay from his house after she had moved. So I wanted her to come to some place where I could see her. She refused to come to Norfolk to live and when she refused I walked out. Nothing more could be said because in my belief I think a man and wife

should be together sometimes and have a place that they can meet. After she left she went and came back with her brother and another fellow and her sister-in-law. Her brother got out of the car first and swung at me without saying one word. We had a little fight in a field outside of my mother's house and in order to avoid trouble, being as I am in Uniform, I ran from him."

This is the wife's account of what occurred:

"A. I asked him if he could talk with me and he asked me what I wanted. He said, 'Anything you have to say, you can say in front of my mother', but I finally got him into the bedroom and we talked for a few minutes, and he hit me, and if there hadn't· been a bed in back of me, I would have fallen on the floor.
"Q. In other words,·he knocked you across the bed?
"A. Yes.
"Q.. With his fists?
"A. Yes.
"Q. Where did he hit you?
"A. On the chest.
"Q. Had you said or done anything to provoke the blow?
"A. No, I did not.
"Q. When he struck you, did you make any outcry?
"A. I hollered—I don't know if ·any one heard· me or not."

The wife said· that he struck her in the chest, knocking her across the bed and cutting her knee, and that she "hollered." Nobody in the adjoining room heard any outcry, and when they came back into it there was nothing unusual about their appearance. Two weeks later he asked her again to come to Norfolk. He said that she again refused to do so. She said that she told him that she would come about the first of January, and that she had promised her employer not to leave during the rush of Christmas holidays. Process

in this suit was served on the defendant on December 30, 1942. There was no marital intercourse between this husband and wife after November 29, 1942. On June 18, 1943, a decree was entered which said, in part:

"It further appearing to the court that the charge of wilful desertion and/or cruelty as alleged in the answer and cross-bill of the defendant, Madeline Laura Moltz, has been fully sustained," etc.

We cannot tell from the use of "and/or" whether the trial court thought that cruelty had been shown, that desertion had been shown or that both had been shown. Its use is criticized in 3 C. J. S. 1068. In *Bell* v. *Wayne United Gas Co.*, 116 W. Va. 280, 298, 181 S. E. 609, 618, it was said to be disingenuous, modernistic, hybrid, inept and irritating, and with this we have no quarrel.

Certainly this husband did not desert his wife when he went into armed service. Her allotment had not been discontinued.

Alleged cruelty has not been corroborated and would not be accepted by us as established even though the statute did not require corroboration.

The trial court ordered the husband to pay $70.00 counsel fees and $50.00 a month alimony. This counsel fee the husband must pay; from the payment of alimony he is relieved.

The decree of the trial court is reversed in all respects, except as to this counsel fee. The cross-bill of respondent is dismissed, and the prayer of the complainant's bill is granted, and he is hereby awarded a divorce *a mensa et thoro;* and the case is remanded to the trial court for further hearing and decision on the question of a divorce *a vinculo* should proper proceedings and evidence be produced.

*Reversed and remanded.*